[S.F. No. 23527. Mar. 18, 1977.]

In re MARTIN JOEL BLOOM on Discipline.

COUNSEL

Martin Joel Bloom, in pro. per., for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

OPINION

**THE COURT.**[*]—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar that Martin Bloom be disciplined.

Bloom, a 34-year-old attorney admitted to practice in 1972, pleaded guilty in 1975 to solicitation to commit bribery (Pen. Code, § 653f). The court suspended imposition of sentence and placed him on two years' probation. In 1976 the court terminated his probation after only one year, deemed the offense a misdemeanor, permitted him to withdraw his guilty plea, and dismissed the information (Pen. Code, § 1203.4).

In the meantime, by an order which became effective July 11, 1975, we placed Bloom on interim suspension since the crime involved moral turpitude (Bus. & Prof. Code, § 6102). Subsequently, after the judgment was final, we referred the matter to the State Bar on the issue of discipline.

Following an evidentiary hearing, the one-member local committee adopted findings and recommended three years' suspension and five years' probation. The board adopted new findings, which are similar to those of the committee, and recommended that we impose discipline. A majority of the entire board, however, did not agree on the extent of discipline. (See former rules 81 and 87, Rules of Proc. of the State Bar as

[*]Before Tobriner, Acting C. J., Mosk, J., Clark, J., Richardson, J., Sullivan, J.,[†] Wright, J.,[‡] and Draper, J.[**]

[†]Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

[‡]Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

[**]Assigned by the Chairman of the Judicial Council.

amended Jan. 1976.) Of the members who voted eight recommended disbarment and three, suspension.[1] The examiner favored suspension.

Bloom graduated with honors from law school in 1972. After passing the bar, he began working as a deputy county counsel in Contra Costa County in early 1973. While he was so employed he committed the crime that gave rise to the instant proceeding. The circumstances surrounding the crime may be summarized as follows:

Quimby Island Reclamation District (hereafter district) applied to Contra Costa County for a land use permit concerning a proposed development of recreational facilities on Quimby Island (hereafter project). The application was denied, and the district filed an appeal with the planning commission. When the planning department asked the county counsel for advice concerning the matter, Bloom was assigned to do the legal research.

On July 31, 1974, Bloom wrote a letter to Charles Williams, an attorney for the district. In the letter Bloom stated the basis upon which the county claimed jurisdiction over the district and the project. A copy of the letter was sent to Marshall Cornblum, another attorney who represented the district.

A second problem arose for the district, namely whether a sewage treatment facility permit would be required from the county. At a meeting on October 3, 1974, Bloom told Cornblum that such a permit was only one of several issues facing the district and that all its problems with the county would disappear upon payment of $150,000. Cornblum asked Bloom how he intended to "pull this off" in view of his July 31, 1974, letter and Bloom replied that he "could . . . allow for a change of opinion" based on authorities or argument not encompassed in his letter.

At the meeting Bloom suggested that part of the $150,000 be paid in advance. Cornblum replied that if an agreement was reached regarding the $150,000, the money would be paid upon resolution of all issues with the county. Cornblum further stated that he would discuss the matter with others and contact Bloom.

---

[1]One of the three recommended following the committee's recommendation; the second, suspension for three to five years; the third, suspension for an unspecified period.

Cornblum promptly reported to the district attorney's office what had occurred and consented to having his subsequent conversations with Bloom recorded.

Cornblum and Bloom met again on October 11 and 22, 1974, regarding Bloom's proposal. On the latter occasion Cornblum asked Bloom why he solicited the bribe, and Bloom replied, "Call it greed." Bloom felt he should be entitled to compensation if he succeeded in solving only some of the issues concerning the project. Cornblum offered $25,000, and Bloom indicated that the sum seemed small.

At a meeting on October 29, 1974, Bloom expressed hesitancy over continuing with the transaction. He stated that there were too many risks and he was too scared to proceed. However, when Cornblum agreed to call the matter off, Bloom stated that he wanted "to go through with it." Cornblum suggested Bloom think the matter over for a few days and then contact him. Bloom did not subsequently contact Cornblum.

Following the October 29 meeting, Cornblum left the country on a trip. Upon his return he learned of negative publicity regarding the district and telephoned Bloom. Cornblum stated that Bloom said that he had nothing to do with the publicity and the "matter [apparently legal work relating to the district]" was now being handled by the county counsel rather than himself because of the publicity. According to Cornblum, Bloom did not say whether or not he wanted "to continue further with discussions that [they] had."

According to a statement Bloom furnished to the probation department, when he received Cornblum's telephone call he told Cornblum that "[Bloom] would not do anything to assist [Cornblum's] plans . . . . [Bloom] made it clear that [he] was not going to help, that [he], by [his] conscious inaction had let the resolution of the legal issues go [to the county counsel] . . . ." Bloom, however, testified that when Cornblum contacted him Bloom "just hedged and said there is nothing [he] could really do, didn't want to talk about it . . . ." He was then asked why he did not make some "statement of unequivocal rejection" of his offer, and he replied that he did not want to alienate Cornblum. He further testified that before he was contacted by the district attorney's office he had determined that his making the offer was a mistake and that he would do "nothing to further the suggestion [he] had made."

There were no meetings between Cornblum and Bloom alone after their above mentioned telephone conversation, and no money ever changed hands.

Bloom was suspended as a deputy county counsel on December 20, 1974, after the criminal complaint was filed against him, and he subsequently resigned. An assistant county counsel found nothing in the office file between October 3 and December 20, 1974, indicating that Bloom acted other than in the county's best interests in the case involving the district.

Bloom testified: He could not completely explain his conduct, but his motivation was economic. He had no pressing financial problems but wished financial independence. He considered his county job an interim one. Part time real estate work and interviews with private employers had proved unsuccessful and as a consequence he felt frustrated. He is married and has two children. Since his conviction he has had difficulty finding work.

Bloom argues that, notwithstanding the seriousness of the crime of which he was convicted, he should not be disbarred because there were mitigating circumstances. In this connection he first asserts that he withdrew his offer to Cornblum. However, although Bloom's statement to the probation department suggests that he did so, neither Bloom's own testimony nor Cornblum's version of the conversation shows that Bloom ever made an unequivocal statement withdrawing his offer, and, as above appears, Bloom sought to explain his failure to make such a statement on the ground he did not want to alienate Cornblum.

That no individual appears to have been harmed by Bloom's conduct is entitled to but little weight, since his crime was not directed against a particular victim but instead impugned the integrity of county government. (Cf. *In re Hanley* (1975) 13 Cal.3d 448, 454 [119 Cal.Rptr. 5, 530 P.2d 1381].)

Bloom has no prior disciplinary record (*In re Distefano* (1975) 13 Cal.3d 476, 480 [119 Cal.Rptr. 105, 531 P.2d 417]), but the absence of such a record is also entitled to but little weight in view of the short period he practiced law (*In re Hanley, supra,* 13 Cal.3d 448, 454). In the instant proceeding he displayed remorse and was cooperative. (*Segretti v. State Bar* (1976) 15 Cal.3d 878, 888 [126 Cal.Rptr. 793, 544 P.2d 929];

*Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].)

Three attorneys employed by the Contra Costa County Counsel's office testified in Bloom's behalf. One of them stated that Bloom "has high respect for morals . . .," that the crime "was more an aberration than anything that would indicate what his values are," and that Bloom has superior legal ability. The other two attorneys commented favorably on Bloom's legal ability. In addition his probation officer testified that she considered him a model probationer, and it appears that he has made contributions to others, such as serving as a volunteer in the Peace Corps in the 1960's.

Bloom has sent to this court a letter by the probation officer amplifying her testimony and a letter by a friend. However, an attorney is under a duty to present to the local committee and the board any evidence which he deems favorable to himself. He may not neglect to do this and then demand in his objections that such evidence be considered by this court or that he be given another hearing before the bar. (See *Barreiro* v. *State Bar* (1970) 2 Cal.3d 912, 925 [88 Cal.Rptr. 192, 471 P.2d 992]; *Coviello* v. *State Bar* (1955) 45 Cal.2d 57, 65 [286 P.2d 357].) Moreover, if the letters had been introduced at the hearing before the committee, they would not have changed our conclusion as to the appropriate discipline in this case.

Disbarment has been commonly but not uniformly imposed in cases involving bribery and soliciting another to offer a bribe. (See, e.g., *In re Weber* (1976) 16 Cal.3d 578 [128 Cal.Rptr. 434, 546 P.2d 1378] [disbarment]; *In re Hanley, supra,* 13 Cal.3d 448 [disbarment]; *In re Todisco* (1963) Bar Misc. 2666 [suspension].) Each case must, of course, turn on its own facts. (*In re Hanley, supra,* 13 Cal.3d 448, 452; *Yapp* v. *State Bar* (1965) 62 Cal.2d 809, 819 [44 Cal.Rptr. 593, 402 P.2d 361].)

■ Bloom's solicitation of a $150,000 bribe for purposes of personal gain manifestly shows that he was then morally unfit to practice law. We conclude in view of the gravity of the crime and in light of all the circumstances of the case that disbarment is appropriate.[2]

---

[2]A disbarred attorney, of course, may file a petition for reinstatement at the time specified in the Rules of Procedure of the State Bar. (See rule 45.30.) In a reinstatement proceeding there must be a showing to the satisfaction of a majority of the entire board that the petitioner, among other things, possesses the requisite moral qualifications to practice law. (See rule 47.20, Rules of Proc. of the State Bar.)

It is therefore ordered that Martin Joel Bloom be disbarred from the practice of law and that his name be stricken from the roll of attorneys, effective 30 days after the filing of this opinion.