[L.A. No. 32061. Mar. 27, 1986.]

In re RAOUL JORGE SEVERO on Disbarment.

COUNSEL

Michael V. Severo for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Hope Snyder for Respondent.

OPINION

THE COURT.*—We consider a recommendation of the State Bar Review Department that petitioner Raoul Jorge Severo, a member of the bar since December 1977, be disbarred, following his conviction on November 3, 1980, in United States District Court of various crimes arising from transactions involving a federally funded poverty program. After reviewing the record and petitioner's objections, we will adopt the bar's conclusion.

On May 1, 1981, we placed petitioner on interim suspension pending finality of his conviction. After the United States Court of Appeals for the Ninth Circuit affirmed his conviction, we referred the matter to the bar for a determination as to whether violation of 18 United States Code section 371 (conspiracy) involved moral turpitude or other conduct warranting discipline, and for an overall recommendation as to appropriate discipline. After finding that petitioner's conduct involved moral turpitude and that petitioner had engaged in misconduct both before and after his admission to the bar, the hearing panel concluded unanimously that disbarment was appropriate under the circumstances. The review department adopted the hear-

---

*Before Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., Lucas, J., and Fukuto (Mario), J.†

†Judge, Los Angeles County Superior Court, assigned by the Chairperson of the Judicial Council.

ing panel's findings of fact and voted ten to one, with one member not participating, to recommend that petitioner be disbarred.

Petitioner then filed before us a petition for review. He concedes that the underlying misconduct involved moral turpitude, but argues that the bar failed to give proper consideration to evidence of mitigating circumstances and that its recommendation is too severe.

## FACTS

The Greater Los Angeles Community Action Agency (GLACAA), founded in 1973, was a "joint powers agency" established by the City and County of Los Angeles to obtain federal funding for various local poverty programs. Frank Mena acted as GLACAA's director of administrative services. Technical Services Institute (TSI) was a private consulting firm owned and operated by Frank Aguilera and Fred Chapa. Petitioner had previously worked with Aguilera, Chapa and Mena.

In June 1977, Mena offered to assist TSI in obtaining a $50,000 audit contract from GLACAA in return for a $10,000 cash kickback. Aguilera and Chapa agreed and, pursuant to their discussions, Aguilera drafted GLACAA's proposal for the contract, an action which normally would have been performed by GLACAA's staff. GLACAA then forwarded the proposal to a number of firms including TSI which might be interested. TSI responded with a proposal drafted by Aguilera and petitioner. Petitioner then joined with Aguilera to evaluate the bids which were submitted. They awarded the highest score to the TSI proposal which was then transmitted to GLACAA's board of directors which awarded the contract to TSI.

After the contract had been awarded, petitioner agreed to help in transferring the $10,000 to Mena. In order to effect payment, two checks were issued by TSI payable to The Minotaur Group, a fictitious business name used by petitioner. The first check was for $6,000 and the second for $9,800. Of the total, $10,000 was given to Mena, $5,000 divided between Aguilera and Chapa, and $800 kept by petitioner as his fee for cashing the checks. The source of the funds was the money received by TSI from the GLACAA contract and intended for use in executing that contract.

Chapa and Mena began discussing GLACAA's legal business around August 1977. Mena asked if Chapa knew an attorney who would give a kickback in exchange for being awarded the legal services contract with the project. Chapa approached petitioner who had taken the July bar examination but had not yet received his results. In September, a two-month legal services contract was awarded to petitioner's brother, Michael Severo, by

GLACAA. Upon expiration of that contract, GLACAA awarded the firm of Severo and Severo, consisting of petitioner and his brother, a 19-month contract. Petitioner passed the bar in December.[1]

Severo and Severo received payments in excess of $145,000 under the contract between December 1977 and September 1978. During the same period, petitioner made monthly payments of $1,000 to Mena in the belief that if he failed to do so, the legal services contract would be terminated.[2]

In July 1979, a Los Angeles Federal Grand Jury began an investigation of GLACAA and subpoenaed TSI's books and records. Those records showed the two checks issued to The Minotaur Group as consulting fees. Neither check had been included as income in petitioner's federal tax returns. In order to correct this discrepancy, the records were altered to show the $9,800 as a loan to petitioner. In August 1979, petitioner provided a backdated and signed promissory note representing that TSI had loaned him $9,000 in 1977. At his hearing, petitioner disputed testimony at the criminal trial that he had suggested the alterations to the books in order to mislead the grand jury, but he admitted that he knowingly provided the false promissory note and that he had done so in order to avoid tax liability.

As a result of the investigation, petitioner and others were charged in United States District Court with various criminal violations. Chapa testified on behalf of the government pursuant to an agreement. Petitioner, who did not take the stand, was convicted after jury trial of nine counts including conspiracy (18 U.S.C. § 371); bribery (*id.*, § 201); concealment of material facts from and fraudulent statements to a federal agency (*id.*, § 1001); aiding and abetting bribery (*id.*, § 2); theft of federal funds (*ibid.*); and obstruction of justice (*id.*, § 1503). On appeal, the Ninth Circuit reversed the convictions for conspiracy and obstruction of justice, and affirmed the remaining convictions. Petitioner, sentenced to five years in federal prison, was released on parole on January 16, 1984.

At the proceeding before the bar hearing panel, petitioner testified that his conduct was due to substantial financial and personal pressures. He stated that he had not earned money for several months while studying for the bar, and had been unable to find work because he had not yet obtained his bar results. The only work he could find was for TSI on an hourly basis, and he was required to give back $5 of each $10 he made. He explained he participated in the kickback schemes because he felt he had no other options

---

[1] Whether petitioner practiced law before admission to the bar is not an issue here.

[2] No charges were made against Michael Severo regarding these payments; he apparently was unaware they were occurring.

and that cooperation with the others involved was the only way for him to continue working. Although he testified that at the time he cashed the checks issued to The Minotaur Group, he did not realize their true purpose, he admitted that he acted in the belief that it would assist Chapa and Aguilera in avoiding payments to legitimate creditors of TSI. He also claimed that the $800 he kept was for back wages rather than a fee. Petitioner further admitted that he made the $1,000 payments to Mena in 1977 and 1978, and that he participated in covering up the transaction involving the TSI kickback checks. He characterizes the latter action as a "misjudgment" which was "an ill-conceived and vain attempt to keep himself from being prosecuted for income tax evasion based upon income that he did not receive to begin with." He also submitted copies of documents provided to the judge at his trial before sentencing, including a letter from a psychiatrist showing he was undergoing therapy.

The hearing panel concluded that petitioner committed acts involving moral turpitude both before and after his admission to the bar and violated his oath and duties as an attorney. (See Bus. & Prof. Code, §§ 6103, 6067, 6068, 6106.) As to findings in aggravation, the panel found petitioner had failed to fully acknowledge his responsibility and that his "limited perspective of the options which were available to him only reveals serious imperfections in his moral character." While petitioner had presented evidence showing his voluntary submission to psychiatric care, the panel found cause for concern in petitioner's lack of self-understanding "together with his own psychiatrist's assessment that he is suffering from deeply-rooted, long-standing psychological and emotional problems, with a fragile personality structure." As noted, it recommended disbarment, and its findings and conclusions were followed by the review department without alteration.

DISCUSSION

Once a conviction is final, "The facts and circumstances surrounding [the] petitioner's crime are relevant only to determine appropriate discipline." (*In re Kirschke* (1976) 16 Cal.3d 902, 904 [129 Cal.Rptr. 780, 549 P.2d 548].) Standing alone, petitioner's crimes warrant disbarment. For example, in *In re Bloom* (1977) 19 Cal.3d 175 [137 Cal.Rptr. 168, 561 P.2d 258], we disbarred an attorney who had been convicted of soliciting a bribe, observing that such punishment was common in cases involving similar misconduct. Theft and embezzlement similarly have provided a basis for disbarment. (See, e.g., *In re Lyons* (1975) 15 Cal.3d 322 [124 Cal.Rptr. 171, 540 P.2d 11] [embezzlement]; *In re Bogart* (1973) 9 Cal.3d 743 [108 Cal.Rptr. 815, 511 P.2d 1167] [theft].) Moreover, misconduct prior to admission to the bar may provide a basis for discipline. (*In re Bogart, supra,* 9 Cal.3d at p. 749.) Petitioner here argues that the bar failed to take into

account a number of asserted mitigating factors in reaching its disciplinary recommendation.

Among the factors which petitioner urges deserve greater weight are the claims: (1) he was a "passive participant" in the kickback schemes; (2) he was "only 27 years old" when the misconduct occurred; (3) his misconduct occurred while he was under pressure from emotional, domestic, and financial sources; (4) he voluntarily sought psychiatric assistance regarding his difficulties and has "successfully completed psychotherapeutic rehabilitation," (5) he has been actively involved in various civic and community activities; (6) he has not practiced for almost five years, and has acknowledged responsibility and "displayed candor, cooperation and remorse throughout the instant proceedings"; (7) he has "suffered the ignominy of a criminal conviction" and served considerable time in prison and on parole; and, finally, (8) his violation occurred "within a relatively short period of time, i.e., from late 1977 to late 1978."

Despite his assertions to the contrary, it appears that petitioner's claimed factors in mitigation were amply considered by the bar and that, considering the sustained nature and underlying acts involved in his misconduct, they do not warrant discipline less than that recommended. ■ In so concluding, we adhere to the principle that the primary purpose of discipline is the protection of the public, the profession and the courts rather than punishment of the attorney. (See *Giovanazzi* v. *State Bar* (1980) 28 Cal.3d 465, 472 [169 Cal.Rptr. 581, 619 P.2d 1005]; *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].) ■ Given the grave nature of petitioner's misconduct, disbarment appears appropriate.

■ The burden is upon petitioner to show that the findings of the bar were erroneous; such findings are invested with a strong presumption in favor of their validity. (See *Tarver* v. *State Bar* (1984) 37 Cal.3d 122, 132 [207 Cal.Rptr. 302, 688 P.2d 911]; *In re Wright* (1973) 10 Cal.3d 374, 377 [110 Cal.Rptr. 348, 515 P.2d 292].) ■ While the bar's recommendation as to discipline is given great weight, we review the record in order to exercise our independent judgment in determining the appropriate discipline. (*Tarver, supra,* at p. 133; *In re Calaway* (1977) 20 Cal.3d 165, 169 [141 Cal.Rptr. 805, 570 P.2d 1223].) In deciding discipline, we consider both the underlying conduct and any relevant aggravating or mitigating factors (*Tarver,* at p. 133).

■ Petitioner's misconduct here was serious and extended over approximately two years. In his contentions regarding the brevity of the period involved, petitioner fails to give weight to his actions involving the alteration of TSI's records before presentation to the grand jury. Petitioner's

argument that by that time he was caught between "a rock and a bad place" and, in essence, thought he had no choice, confirms the bar's view that petitioner's belief in his limited options—and his responses thereto—are cause for concern. As to the kickbacks themselves, petitioner argues they were the result of financial and other pressures. In amplification, he maintains that he had been unable to find work while waiting for the bar results and thus felt trapped into complying with the wishes of his cohorts in order to support his family.

We find petitioner's rationales less than convincing. Petitioner, at age 27, was, if anything, older than many recent law graduates. He had worked during and before law school and was thus not a total neophyte in the area of business practice and ethics. His claim based on financial pressures in the period between taking and passing the bar is unpersuasive as well. Thousands of prospective lawyers, many of them with families, must support themselves before receiving bar results; few, we trust, turn to criminal acts to do so. Nor do petitioner's "youth and inexperience" provide a basis here for concluding that his conduct should be viewed leniently and that he is presently able to practice law. He did not act negligently or by mistake, but participated knowingly in illegal acts. (See *In re Possino* (1984) 37 Cal.3d 163, 172 [207 Cal.Rptr. 543, 689 P.2d 115] [youth and inexperience no excuse for engaging in large-scale drug transactions or misconduct with jurors deciding one's fate]; *In re Petty* (1981) 29 Cal.3d 356, 361 [173 Cal.Rptr. 461, 627 P.2d 191].)

Petitioner's misconduct began before he was admitted to the bar and continued once he had passed and was therefore employable as a lawyer by anyone, not only his brother. There was no evidence that at that point it would have been impossible for him to obtain other employment and to thus meet his obligations without paying kickbacks. Instead, petitioner chose to continue to pay Mena $1,000 a month until Mena left GLACAA. Nor do we find lack of other misconduct while practicing a factor in mitigation considering the timing of petitioner's admission to practice, his indictment in August 1980, and the period of his misdeeds. Petitioner's misconduct in fact extended over most of the short period he actively practiced.[3] (See *In re Petty, supra,* 29 Cal.3d at p. 361; *In re Bloom, supra,* 19 Cal.3d at p. 179.)

Petitioner also argues that the bar erroneously found that the psychiatrist's report he submitted was a factor in aggravation rather than mitigation. In support of his claim he has lodged a report and declaration by

---

[3]Petitioner voluntarily refrained from practice after his indictment. Thus, he was in active practice for less than three years.

the psychiatrist before us. Neither document was made available to the bar. ■ Normally, we will not consider evidence not presented to the bar during its review process, and petitioner has not made a formal request for us to do so here. (See *Tarver* v. *State Bar, supra,* 37 Cal.3d at p. 131; State Bar Rules of Proc., rule 562.) Even where we have considered such evidence we have reiterated our "strong preference" for such matters to be presented to the hearing panel and observed "This preference is particularly strong where, as here, the extrinsic evidence consists of opinions about petitioner's mental attitude, and is based largely on petitioner's own out-of-court statements. Such evidence is virtually impossible to evaluate in the absence of cross-examination." (*In re Possino, supra,* 37 Cal.3d at p. 171, fn. omitted.) The same considerations apply here.

■ In any event, petitioner's argument that the original report's contents should be seen only as a factor in mitigation was presented to the bar. Contrary to petitioner's claims, however, the bar reasonably found that the report, introduced by petitioner himself at the hearing, contained information about longstanding emotional problems which were relevant to petitioner's ability to function under stress and to practice law. The contents of the report, moreover, were mentioned as "cause for concern" rather than as controlling factors, and they were expressly considered only in conjunction with other independent conclusions regarding petitioner's responses.

■ Next, because of his criminal conviction and his time in prison, petitioner also argues that he has been sufficiently punished. He relies primarily on *In re Battin* (1980) 28 Cal.3d 231 [168 Cal.Rptr. 477, 617 P.2d 1109], in support of his claim that such punishment should be considered adequate. In *Battin* the bar had determined that an attorney convicted of misuse of public funds should be subjected to discipline. The three-member hearing panel, however, was unable to reach agreement on appropriate discipline and the bar review panel recommended that a hearing de novo be held before a new hearing panel. Observing that petitioner had served the sentence imposed, paid his fine and met all probation requirements, and that there was no evidence of other discipline by the bar, a four-member majority of the court concluded without discussion that the punishment "appears to have been sufficient" and that public reproval was sufficient discipline. (*Id.* at p. 236.)[4] Our summary reference to and reliance on the "sufficiency of punishment" in *Battin* does not appear to have established a new approach which departed from the one long followed by this court.

■ As we have noted, the standard and oft-repeated declaration of the purpose of disciplinary proceedings is that they are intended "not so much

---

[4]Public reproval was the least stringent discipline found appropriate by any of the referees.

to punish [an attorney] as to ascertain his fitness to practice law." (*In re Conflenti* (1981) 29 Cal.3d 120, 123 [172 Cal.Rptr. 203, 624 P.2d 253]; 1 Witkin, Cal. Procedure (1985) Attorneys, § 476, at pp. 524-525.) ▇ As petitioner points out, we have on occasion considered as relevant the fact that an attorney has "'suffered the ignominy of a criminal conviction [and] has served time in a [federal] penal institution . . . .'" (*In re Kreamer* (1975) 14 Cal.3d 524, 532 [121 Cal.Rptr. 600, 535 P.2d 728]; *Segretti* v. *State Bar* (1976) 15 Cal.3d 878, 889 [126 Cal.Rptr. 793, 544 P.2d 929].) Punishment pursuant to a criminal conviction, however, does not take the place of our independent determination of appropriate discipline for the individual who, as an attorney, carries additional ethical and fiduciary obligations. Moreover, unlike the situation in *Segretti* and cases cited therein, petitioner did not show that after he committed his offenses he "recognized their wrongfulness, expressed regret, and cooperated with the investigating agencies." (15 Cal.3d at pp. 888-889, fn. omitted.) While he points to his "candor and cooperation" before the bar, he can make no such claim as to his conduct during the criminal investigation. ▇ Of course, failure to cooperate during the criminal investigation is not a factor in aggravation although the converse has been considered as a circumstance in mitigation. (Compare *In re Cohen* (1974) 11 Cal.3d 416, 422 [113 Cal.Rptr. 485, 521 P.2d 477] [petitioner's "honesty and cooperation when he was arrested" cited favorably].)

▇ After reviewing the record of the underlying convictions and the matters presented to the bar during disciplinary proceedings, we concur with the bar's recommendation that disbarment is appropriate. Petitioner offers excuses for his conduct at every step of the way and continues to perceive himself as primarily a victim of circumstance. Under the facts of this case, we believe that evidence of petitioner's fitness to practice law would be most persuasive if presented at reinstatement proceedings following disbarment. At that time, he "may be able to show by sustained exemplary conduct over an extended period of time that [he has] reattained the standard of fitness to practice law." (*In re Petty, supra,* 29 Cal.3d at p. 362; *Tarver* v. *State Bar, supra,* 37 Cal.3d at p. 135, fn. 4.)

Accordingly, it is ordered that Raoul Jorge Severo be disbarred from the practice of law and that his name be stricken from the roll of attorneys.[5]

**BIRD, C. J.**—Although I agree with my colleagues that petitioner should be disbarred, I write separately to ensure that certain language in the court's opinion is not misinterpreted.

---

[5]Because he has been suspended from the practice of law since May 1, 1981, we do not order compliance with the provisions of rule 955 of the California Rules of Court.

Petitioner relies on *Segretti* v. *State Bar* (1976) 15 Cal.3d 878 [126 Cal.Rptr. 793, 544 P.2d 929], to support his assertion that discipline is unwarranted here because his criminal conviction and resulting imprisonment constituted sufficient punishment. In discussing *Segretti*, the majority state that "unlike the situation in *Segretti* and cases cited therein, petitioner did not show that after he committed his offenses he 'recognized their wrongfulness, expressed regret, and cooperated with the investigating agencies.' [Citation.] While he points to his 'candor and cooperation' before the bar, he can make no such claim as to his conduct during the criminal investigation." (Majority opn., *ante,* at p. 503.) This language arguably implies that failure, during a criminal investigation, to waive the privilege against self-incrimination can be used against an attorney in a subsequent disciplinary proceeding. This is not true.

The Fifth Amendment privilege against self-incrimination guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, *and to suffer no penalty . . . for such silence.*" (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 8 [12 L.Ed.2d 653, 659 84 S.Ct. 1489], italics added.) The United States Supreme Court has held that the term "penalty" as used in this context is not limited to fine or imprisonment but includes "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" (*Spevack* v. *Klein* (1967) 385 U.S. 511, 514-515 [17 L.Ed.2d 574, 577, 87 S.Ct. 625]; see also *Griffin* v. *California* (1965) 380 U.S. 609, 614 [14 L.Ed.2d 106, 109, 85 S.Ct. 1229].)

Assertion of the privilege is certainly costly if refusal to testify or cooperate in criminal proceedings can be used by the State Bar as an aggravating factor in determining discipline. Therefore, although cooperation in an underlying criminal proceeding has occasionally been cited by this court as a mitigating factor in State Bar disciplinary proceedings (see *In re Cohen* (1974) 11 Cal.3d 416, 422 [113 Cal.Rptr. 485, 521 P.2d 477]; *In re Higbie* (1972) 6 Cal.3d 562, 574 [99 Cal.Rptr. 865, 493 P.2d 97]; *Segretti* v. *State Bar, supra,* 15 Cal.3d at p. 888, & fn. 5 [testimony under grant of use immunity]), refusal to cooperate cannot, consistent with the Fifth Amendment, be considered as a factor in aggravation. Today's opinion is in keeping with that rule.