[No. S014373.  Dec.  6,  1990.]

In  re  JOHN  ELBERT  CROOKS  on  Disbarment.

## COUNSEL

John E. Crooks, in pro. per., for Petitioner.

Diane C. Yu, Richard J. Zanassi, Carole Hann and Erica Tabachnick for Respondent.

## OPINION

**THE COURT.**—We review the augmented report and recommendations of the Review Department of the State Bar Court of California (review department) that John Elbert Crooks's (Crooks) violation of 18 United States Code section 371 be deemed to have involved moral turpitude and that Crooks be disbarred from the practice of law. After reviewing the record and Crooks's contentions, we adopt the recommendation of the review department.

### I.

### FACTS AND PROCEEDINGS BELOW

Crooks was admitted to the practice of law in California in 1933. On June 14, 1984, Crooks was convicted in the United States District Court for the Central District of California of conspiracy to defraud the United States (18 U.S.C. § 371). On July 30, 1984, Crooks was sentenced to two years' imprisonment for this offense. Crooks appealed and on November 25, 1986, the Ninth Circuit Court of Appeals (Canby, J.) affirmed Crooks's conviction. (*United States* v. *Crooks* (9th Cir. 1986) 804 F.2d 1441.) On August 26,

1987, Crooks's petition for rehearing was denied. (*U.S.* v. *Crooks* (9th Cir. 1987) 826 F.2d 4.)

The subject of the conspiracy was a tax shelter investment scheme designed by Crooks's coconspirator, Attorney Joseph R. Laird, Jr. (Laird). Under the scheme, prospective investors were solicited to invest funds and encouraged thereafter to claim tax deductions in amounts several times the amount of their invested funds. According to Crooks, a total of 10,000 prospective investors were solicited. Over 3,700 investors became involved in a total of 221 different limited partnerships and, at peak, well over $39 million was invested.

The investors were led to believe that they were entitled to over $105 million in tax deductions because the partnerships would make advance mineral royalty payments which would be tax deductible. Such deductions were fraudulent, however, because the payments to support such deductions were never made; various shell entities formed by Crooks and Laird never had any funds other than the investors' funds. To conceal the fact that the advance mineral royalty payments were not really being made, these shell entities were created to generate large numbers of cancelled checks representing purported loans and purported tax deductible payments simultaneously. All these checks cleared the bank because they offset each other. Thus, the claimed deductions lacked economic substance.

Crooks helped to set up two sham Nevada partnerships to be used in the check swapping scheme designed by Laird. Crooks knew that at least one of these partnerships was a mere conduit of funds. Crooks also did the paperwork to establish, and was a shareholder of, certain other sham entities which were falsely represented to investors as having independently agreed to make loans to some of the partnerships involved in the scheme.

Crooks signed tax opinion letters prepared by Laird for each of the limited partnerships. He thereby gave the impression that he, as an independent attorney not otherwise connected with the tax shelter scheme, had prepared the letters and affirmed their contents. Crooks denies that these tax opinion letters enticed prospective investors. However, he never suggested to Laird that facts additional to those contained in the letters, such as would have exposed the sham nature of the putative deductible transactions, be disclosed to potential investors.

A November 12, 1976, tax opinion letter, which Crooks signed, stated that a D.W. Pennington, Inc., was an independent, unrelated third party and that another company, Dynarad, Inc., was a public company not owned by the general partners in the tax shelter scheme. Crooks knew that

these statements were untrue, that D.W. Pennington was Laird's uncle, and that both companies were completely under Laird's control. Furthermore, to create the impression that D.W. Pennington, Inc., had made certain loans which had in fact not been made, bank accounts were opened and checks simultaneously deposited to create a check swapping circle among D.W. Pennington, Inc., the limited partnerships, and the purported payee of the alleged tax deductible payments. When he signed the November 12, 1976, tax opinion letter, Crooks knew all the relevant details of the financing scheme involving D.W. Pennington, Inc.

Crooks denies he was involved in making sales of partnership interests. The record, however, suggests otherwise. Crooks solicited the sale of partnership interests among employees of Cal Am Corporation, one of the companies which Laird had set up to promote his tax shelter scheme. One of those Crooks solicited was Art Serxner, head of the Cal Am Corporation national sales office. Crooks also solicited Dan Jackson to invest in the Sun River Ranch, Inc., a Washington corporation controlled by Cal Am Corporation. In the sale of partnership interests, Crooks made material misrepresentations, and knowingly and wilfully failed to disclose material facts which were known to him.

When a mailgram was received from the Securities Exchange Commission in December 1976 ordering Cal Am Corporation to stop selling the limited partnership interests, Crooks met with Laird. Laird decided to hide the mailgram under some papers on his secretary's desk until the following Monday morning of the new year, so that in the interim he and Crooks could continue with the sale and processing of limited partnership interests.

In 1976, Crooks received a bonus of $100,000 plus a $5,000 per month retainer for his participation in the tax shelter scheme. Crooks maintains that these funds were received in payment for legitimate legal services rendered to Laird.

Crooks admits he was not under Laird's control or subservient to him; thus, his actions in furtherance of the conspiracy were voluntary.

On March 15, 1989, pursuant to our conviction referral order of September 11, 1985, a hearing panel of the State Bar Court (hearing panel) issued an augmented report and recommendations. The conclusion of the report, on the basis of evidentiary hearings, was that the facts and circumstances surrounding Crooks's conspiracy conviction involved moral turpitude. The hearing panel recommended that Crooks be disbarred. The hearing panel's report was unanimously adopted by the review department (Referee Carlin not participating) on September 14, 1989.

Neither the hearing panel nor the review department found any mitigating circumstances surrounding Crooks's conviction for conspiracy. As aggravating circumstances, both the hearing panel and the review department noted that: (1) in October 1970 we publicly reproved Crooks for wilfully misappropriating to his own use $790.30 which he had been holding in trust (*Crooks* v. *State Bar* (1970) 3 Cal.3d 346 [90 Cal.Rptr. 600, 475 P.2d 872]) and (2) there was no evidence that Crooks recognized that the conduct which led to his conspiracy conviction was wrong or that he had remorse for this misconduct, which was surrounded by bad faith, dishonesty, and concealment.

Crooks filed objections to the augmented report and recommendations of the State Bar on March 2, 1990.

## II.

### DISCUSSION

The record of Crooks's conviction is conclusive evidence that he is guilty of the crime of conspiracy to defraud the United States. (Bus. & Prof. Code, § 6101, subd. (a).) Conviction of a felony or a misdemeanor involving moral turpitude constitutes a cause for disbarment or suspension of an attorney. (Bus. & Prof. Code, § 6101.) Furthermore, standard 3.2 of the Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V; all further references to standards are to this source) provides that disbarment may be warranted when an attorney is convicted of a crime which involves moral turpitude.[1]

■ The determination of the hearing panel that Crooks's conduct involved moral turpitude is entitled to great weight. (*In re Kreamer* (1975) 14 Cal.3d 524, 532, fn. 5 [121 Cal.Rptr. 600, 535 P.2d 728].) ■ In addition, while we must exercise independent judgment in determining the appropriate level of discipline to be imposed in any particular case (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550 [237 Cal.Rptr. 168, 736 P.2d 754]), we give great weight to the disciplinary recommendation—in this case, disbarment—of the review department. (*In re Severo* (1986) 41 Cal.3d 493, 500 [224 Cal.Rptr. 106, 714 P.2d 1244].) Ultimately, Crooks bears the burden of showing that the review department's recommendation is erroneous or unlawful. (Bus. & Prof. Code, § 6083, subd. (c); *Weber* v. *State Bar* (1988) 47 Cal.3d 492, 501 [253 Cal.Rptr. 573, 764 P.2d 701].)

---

[1] Standard 3.2 provides in relevant part that "[f]inal conviction of a member of a crime which involves moral turpitude, either inherently or in the facts and circumstances surrounding the crime's commission shall result in disbarment. Only if the most compelling mitigating circumstances clearly predominate, shall disbarment not be imposed . . . ."

Crooks raises a number of procedural and substantive objections to the report and recommendations of the State Bar.

■ First, Crooks complains that both he and his wife, for whom he is the sole caregiver, are in very poor health. For this reason, he claims he was unable to properly research and prepare his petition to this court. Crooks notes that on February 7, 1990, we returned to him, unfiled, his request that we provide him an attorney by appointment and that we extend the deadline for filing his petition.

While we sympathize with Crooks's personal burdens, they are not grounds for finding that the proceedings in his case have been fundamentally unfair. Crooks's only due process entitlement is to a fair hearing overall. (*Walker* v. *State Bar* (1989) 49 Cal.3d 1107, 1115-1116 [264 Cal.Rptr. 825, 783 P.2d 184].) Attorneys who face disciplinary proceedings have no constitutional right to the assistance of counsel. (*Ibid.*) Accordingly, this court's letter of February 7, 1990, advising Crooks that he was permitted to file a petition on his own behalf, was proper. Furthermore, Crooks fails to demonstrate that the presentation of his defense has been in any way prejudiced by the denial of his requests. Despite his asserted hardships, Crooks successfully prepared and filed, on March 2, 1990, his objections to the report and recommendations of the State Bar.

While we have considered the stress associated with illness in the family as a mitigating factor in discipline cases (see *In re Mostman* (1989) 47 Cal.3d 725, 742-743 [254 Cal.Rptr. 286, 765 P.2d 448] [disbarment recommendation mitigated to suspension partly because stress of caring for mother with Alzheimer's disease contributed to criminal misconduct]), we have been inclined to do so most when a "petitioner has credibly shown remorse and sorrow concerning his actions, that he has accepted responsibility for them and that he has taken steps . . . to ensure that he is better able to deal with any similar problems in the future." (*Id.* at p. 742.) As previously noted, the record reflects that Crooks has shown no such remorse. Nor does the record show that Crooks has taken remedial steps in connection with the stress factors in his life to ensure that future misconduct is unlikely.[2]

Second, Crooks argues that he faces professional discipline on the basis of a conviction for a "non-crime." While Crooks acknowledges his conviction, he asks us to "take note of what the conduct was that produced the conviction," and argues that his conduct really was not criminal. In this connection, Crooks calls our attention to *U.S.* v. *Kilpatrick* (D.Colo. 1989) 726

---

[2] On the day before the scheduled oral argument in this case, Crooks sought a continuation of the matter. We denied his request. Crooks failed to appear at oral argument, and the matter was then submitted on the record without oral argument.

F.Supp. 789, where the defendants were acquitted of violating 18 United States Code 371 in connection with a tax deduction scheme which Crooks claims was "identical" to the one underlying his own conviction.

■ As previously noted, in State Bar disciplinary proceedings, an attorney's criminal conviction is conclusive proof that the attorney committed the crime of which he is convicted. (Bus. & Prof. Code, § 6101, subd. (a); *In re Schwartz* (1982) 31 Cal.3d 395, 400 [182 Cal.Rptr. 640, 644 P.2d 833, 26 A.L.R.4th 1077].) Crooks was convicted of conspiracy to defraud the United States. (See *United States* v. *Crooks, supra,* 804 F.2d 1441, 1444.) Conspiracy to defraud the United States is a crime. (18 U.S.C. § 371.) For the purposes of these proceedings, Crooks stands, indisputably, guilty of the crime of conspiracy to defraud the United States.

Even if we were permitted to look behind Crooks's conviction to reexamine the question of his guilt, *U.S.* v. *Kilpatrick, supra,* 726 F.Supp. 789, does not support the conclusion that Crooks's conviction was erroneous. It is true, as Crooks points out, that the defendants in that case promoted the sale of limited partnership interests in putative mineral deposits by telling investors they could take tax deductions several times their investment, much in the same manner as Crooks and Laird promoted the sale of their scheme. In fact, the defendants in that case apparently learned much about setting up such a program from Laird and his associates. (*Id.* at p. 793.) Like Laird and Crooks, they employed advance mineral royalty payments and "check circles" to generate deductible transactions. (*Id.* at pp. 790-791.)

The district court in *U.S.* v. *Kilpatrick, supra,* 726 F.Supp. 789, acquitted the defendants despite its feeling that the government had made out "a strong prima facie case of fraud." (*Id.* at p. 798.) Noting that proof of check circles by itself is not necessarily proof of fraud (*id.* at p. 799), the court ruled that the transactions at issue had not been sufficiently proven to be without substance because the "failure to disprove the existence of the coal reserves [was] a fatal flaw in the prosecution's case." (*Id.* at p. 794.) Ultimately, said the court, "[t]hese failures of proof create a reasonable doubt concerning the economic substance of the programs which entitles the defendants to acquittal of the conspiracy charges." (*Id.* at p. 799.)

Obviously, the finder of fact in Crooks's case was assailed by no such reasonable doubt. Crooks's conviction was upheld against the reasonable doubt standard (*United States* v. *Crooks, supra,* 804 F.2d at p. 1448) and on the basis of a finding that the transactions in his case lacked economic substance. (*Ibid.*) The mere fact that Crooks's conviction stems from involvement in a scheme the outlines of which were similar to the scheme in *U.S.* v. *Kilpatrick, supra,* 726 F.Supp. 789, provides no grounds for ignoring

the factual differences, as found by the respective courts, between the two cases.

Third, Crooks complains that his timely election to have his case heard by a panel of three referees, pursuant to former rule 558 of the Rules of Procedure of the State Bar (former rule 558),[3] was improperly denied.

Crooks filed his election for a three-referee panel on August 25, 1986. At this time, former rule 558 provided that, notwithstanding such an election, either the State Bar examiner or a petitioner or applicant may file a motion for an order assigning the proceeding to a single referee. Former rule 558 further provided that the presiding referee or a designee shall consider "all relevant factors" in assessing such a motion, and that "[t]he decision of the presiding referee or designee to grant or deny a motion to assign the proceeding to a single compensated referee shall be final within the State Bar Court, unless . . . either the examiner or the member or applicant serves and files with the board committee a request for review of the ruling."

Crooks admits that the procedures outlined in former rule 558 were followed in his case. His election for a three-member panel was considered and rejected. Crooks does not attack these procedures as being fundamentally unfair. Nor does he point to any aspect of these procedures which prejudiced the outcome of his case. Crooks merely asserts that he was "denied due process of law because the referee was appointed in violation of the Rules of Procedure of the State Bar." ■ The assignment of a single-member panel in State Bar disciplinary proceedings does not constitute a denial of due process. (*In re Demergian* (1989) 48 Cal.3d 284, 292-293 [256 Cal.Rptr. 392, 768 P.2d 1069].)

Crooks's petition also notes that the State Bar Court refused to permit his case to be heard by a retired judge pursuant to former section 6079 of the Business and Professions Code (former section 6079).[4] Former section 6079 provided, inter alia, that State Bar disciplinary proceedings would, subject to their availability, be heard by retired judges "if the presiding referee of the State Bar Court or his or her designee determines that the matter or proceeding is complex, or that the trial is likely to be in excess of one day, or the circumstances dictate that it cannot be heard by volunteer referees

---

[3] Former rule 558 was amended by the Board of Governors of the State Bar in 1987. The 1987 amendments were adopted to apply to proceedings commenced on or after January 1, 1987. (Res. of the Board of Governors of the State Bar of Cal. adopted Jan. 24, 1987, re Amend. of Rule 558.) Obviously, this does not encompass the proceedings in Crooks's case, which commenced with our referral order of September 11, 1985.

[4] Former section 6079 was repealed by the Legislature in 1988. (Stats. 1988, ch. 1159, § 6, No. 4 Deering's Adv. Legis. Service, p. 4140, operative July 1, 1989.)

. . . ." (Former § 6079, added by Stats. 1986, ch. 1114, § 2, p. 3912, and repealed by Stats. 1988, ch. 1159, § 6, No. 4 Deering's Adv. Legis. Service, p. 4140.) Former section 6079 created no rights in Crooks other than to have his motion for hearing by a retired judge heard in a manner which comports with due process. (*Conway* v. *State Bar* (1989) 47 Cal.3d 1107, 1120 [255 Cal.Rptr. 390, 767 P.2d 657, 80 A.L.R.4th 101].) Crooks admits that his motion for appointment of a retired judge was heard by the referee in his case, denied, and upheld on administrative review. It is not possible to discern from Crooks's petition what further complaint he harbors about the denial of his motion.

Fourth, Crooks argues that he was denied due process of law because Leon S. Paule, the referee who heard Crooks's case, contrary to former rule 230 of the Rules of Procedure of the State Bar (former rule 230),[5] heard and ruled upon Crooks's motion to disqualify Paule.

■ The combination of investigative and adjudicative functions in one government agency does not, without more, constitute a due process violation. (*Withrow* v. *Larkin* (1975) 421 U.S. 35, 52-54 [43 L.Ed.2d 712, 726-728, 95 S.Ct. 1456].) Nor was it a violation of former rule 230 that Mr. Paule ruled on Crooks's motion to disqualify him.

Former rule 230 provided, in pertinent part, that "either the examiner or the respondent may challenge a referee under any of the grounds set forth in this rule." Former rule 230 went on to state that "[a] referee assigned to a particular matter may recuse himself or herself. Where grounds for a challenge have been established, the referee shall recuse himself or herself. If the recusal is not made and if the challenged referee is assigned for a master calendar session at which a supervising referee is presiding, the examiner or respondent may present the recusal motion to the supervising referee . . . . If the challenged referee was not assigned at a master calendar session at which a supervising referee presided . . . the motion for disqualification may be presented to the presiding referee within ten (10) days after the affected referee denied the challenge . . . ." Thus, while former rule 230 did not state, in so many words, that a recusal motion was to be heard and ruled upon by the challenged referee himself, it clearly implied that such was the intended procedure. Crooks offers nothing other than his unsupported assertion for the notion that another reading of the rule is to be preferred.

Fifth, Crooks complains that certain unspecified "papers" were admitted into evidence at his hearing without authentication, in violation of, again

---

[5] A new version of rule 230, governing the disqualification of referees in disciplinary proceedings, not applicable at the time Crooks moved to disqualify Mr. Paule, was adopted by the Board of Governors of the State Bar effective September 1, 1989.

unspecified, sections of the Evidence Code. The brief of the respondent State Bar takes Crooks to refer in this connection to the photocopy of the transcript of Crooks's conspiracy trial in federal district court which was introduced at the disciplinary hearing. We will do likewise.

Crooks had advance notice that these transcripts were to be introduced. The Evidence Code provides that "[a] duplicate is admissible to the same extent as an original unless (a) a genuine question is raised as to the authenticity of the original or (b) in the circumstances it would be unfair to admit the duplicate in lieu of the original." (Evid. Code, § 1511.) Crooks does not contend in his petition to this court, nor does the record suggest, that he raised a genuine question as to the authenticity of the original transcripts of his trial or that under the circumstances it was unfair to admit the photocopy at his hearing. He merely asserts that "a determination of fact based upon unauthenticated paper denies an interested person due process of law." Thus Crooks fails to demonstrate that any of the circumstances in which Evidence Code section 1511 implies a duplicate may *not* be admissible to the same extent as an original, occurred at his hearing.

Sixth, Crooks argues that he has been improperly subjected to "triple jeopardy" because, though he was acquitted in federal court of 13 counts of mail fraud, he was, nevertheless, subsequently tried and convicted on a conspiracy count and thereafter subjected to disciplinary proceedings, all on the basis of the same underlying conduct.

Crooks's prosecution for conspiracy after he was acquitted for mail fraud did not subject him to double jeopardy, because, while the sham nature of transactions in Laird and Crooks's scheme was litigated in their trial for mail fraud, it was not necessarily decided by their acquittal on those counts. (*United States* v. *Crooks, supra*, 804 F.2d 1441, 1447.) Since Crooks was not placed in double jeopardy by his trial for conspiracy, he cannot be said to be in "triple jeopardy" because he is now subjected to disciplinary proceedings.

As we have previously stated, "State Bar disciplinary proceedings are administrative in nature, not governed by the rules of criminal procedure. (*Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 225-226 [113 Cal.Rptr. 175, 520 P.2d 991].) Petitioner's only due process entitlement is to a 'fair hearing.' (*Rosenthal* v. *State Bar* (1987) 43 Cal.3d 612, 634 [238 Cal.Rptr. 377, 738 P.2d 723].)" (*Walker* v. *State Bar, supra*, 49 Cal.3d 1107, 1115-1116.) Specifically with respect to double jeopardy, we have also stated, "The defense applies only in criminal actions (*Breed* v. *Jones* (1975) 421 U.S. 519 . . .), and . . . the present State Bar proceeding . . . is [not] a criminal action." (*Hawkins* v. *State Bar* (1979) 23 Cal.3d 622, 628 [153

Cal.Rptr. 234, 591 P.2d 524].) Consequently, we reject Crooks's claim that he has been subjected to "triple jeopardy."

■ Lastly, Crooks asserts, without elaboration, that "disbarment is too harsh a sanction under the circumstances." As noted previously, neither the hearing panel nor the review department found any factors in mitigation in this case. Other than noting his poor physical health, and that of his wife, with which we have previously dealt, Crooks suggests no mitigating factors worthy of consideration.

In short, Crooks's contentions provide no grounds for departing from the recommended discipline in his case. We have held that "[u]nder sections 6101 and 6102 of the Business and Professions Code, disbarments, and not suspensions, have been the rule rather than the exception in cases of serious crimes involving moral turpitude . . . ." (*In re Bogart* (1973) 9 Cal.3d 743, 748 [108 Cal.Rptr. 815, 511 P.2d 1167].) We have frequently disbarred attorneys upon such convictions. (See, e.g., *In re Ford* (1988) 44 Cal.3d 810 [244 Cal.Rptr. 476, 749 P.2d 1331] [embezzlement]; *In re Severo, supra*, 41 Cal.3d 493 [bribery; theft of federal funds]; *In re Possino* (1984) 37 Cal.3d 163 [207 Cal.Rptr. 543, 689 P.2d 115] [possession of marijuana for sale]; *In re Schwartz* (1982) 31 Cal.3d 395 [182 Cal.Rptr. 640, 644 P.2d 833, 26 A.L.R.4th 1077] [use of U.S. Postal Service to defraud]; *In re Calway* (1977) 20 Cal.3d 165 [141 Cal.Rptr. 805, 570 P.2d 1223] [conspiracy to commit illegal gambling]; *In re Bloom* (1977) 19 Cal.3d 175 [137 Cal.Rptr. 168, 561 P.2d 258] [soliciting a bribe]; *In re Weber* (1976) 16 Cal.3d 578 [128 Cal.Rptr. 434, 546 P.2d 1378] [soliciting another to offer a bribe]; *In re Wright* (1973) 10 Cal.3d 374 [110 Cal.Rptr. 348, 515 P.2d 292] [grand theft]; *In re Bogart, supra*, 9 Cal.3d 743 [grand theft; forgery].)

### III.

#### DISPOSITION

For the foregoing reasons, we conclude that the facts and circumstances surrounding the conviction of John Elbert Crooks for violating 18 United States Code section 371 involved moral turpitude. It is hereby ordered that John Elbert Crooks is disbarred from the practice of law in California. His name shall be stricken from the roll of California attorneys. He is ordered to comply with rule 955 of the California Rules of Court (rule 955), and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. Failure to comply with rule 955 may result in imprisonment. (Bus. & Prof. Code,

§ 6126, subd. (c).) This order is effective upon the finality of this decision in this court. (See Cal. Rules of Court, rule 953(a).)