[S.F. No. 23364. July 19, 1976.]

In re JAMES SPENCER HURWITZ on Disbarment.

## COUNSEL

James Spencer Hurwitz, in pro. per., William K. Coblentz and Jonathan M. Rutledge for Petitioner.

Herbert M. Rosenthal for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be disbarred.

Petitioner, who was admitted to the practice of law in 1970, has no prior record of discipline. He was originally indicted on a charge of burglary (Pen. Code, § 459), but at jury trial, was found guilty of the lesser and included offense of unauthorized entry of property (Pen. Code, § 602.5).[1] In 1974 we referred the matter to the State Bar for a hearing and report as to whether the facts and circumstances surrounding the commission of the offense involved moral turpitude or other misconduct and, if so found, for a recommendation as to the appropriate discipline to be imposed. The single member local administrative committee found that the facts and circumstances surrounding petitioner's violation of Penal Code section 602.5 involved moral turpitude and recommended that he be suspended from the practice of law for one year. The board unanimously adopted the committee's findings but recommended that petitioner be disbarred.

In mid-1972, following the death of her husband, petitioner was retained by Eva Pompei, a long-time family friend, to negotiate sale of the Pompei family's restaurant. Pursuant to her normal routine, on Saturday, July 1, 1972, Ms. Pompei left home approximately 3:30 p.m. to go to the restaurant to work. Approximately 6 p.m. that same day, petitioner, who had not previously been to the Pompei home, arrived there to discuss with Ms. Pompei "a couple of things of a pressing nature" in connection with the restaurant sale.

Rose Hennessy, a neighbor of Ms. Pompei's, observed petitioner standing on the Pompei front porch and periodically glancing toward the street "to see if someone was around." After Ms. Hennessy saw petitioner "jam" the front door and enter the Pompei house, she contacted Louis Granelli, Ms. Pompei's next door neighbor, and told him what she had just observed.

Granelli immediately asked his wife to telephone the police, grabbed his .22 caliber rifle and proceeded to the Pompei home with his son, Harry, to investigate. After he went up to the front stairs of the Pompei residence, rang the doorbell and observed petitioner momentarily

---

[1]Section 602.5 provides: "Every person other than a public officer or employee acting within the course and scope of his employment in performance of a duty imposed by law, who enters or remains in any noncommercial dwelling, house, apartment, or other such place without consent of the owner, his agent, or the person in lawful possession thereof, is guilty of a misdemeanor."

As a penalty for his violation of section 602.5, petitioner was placed on probation for 3 years, served 30 days in the county jail and was ordered to pay a $500 fine.

looking out the kitchen window at him, Louis Granelli told his son to go around into the backyard of the Pompei house to investigate.

When Harry Granelli arrived at the back door of the Pompei home, he looked through a rear window and observed petitioner "hurrying to open the door" and looking "like he was trying to get out." Shortly thereafter petitioner opened the rear door of the Pompei house. When Harry Granelli inquired as to what he was doing, petitioner stated that he was a friend of the Pompei family and was there doing some work for Ms. Pompei. At this time, petitioner "had some old clothes like a sweat shirt on" and was wearing a pair of yellow rubber gloves on his hands.

Petitioner and Harry Granelli proceeded to walk toward the Pompei garage where they were encountered by Louis Granelli who observed petitioner putting some yellow rubber gloves in his back pocket. Louis Granelli's suspicions were further aroused when he asked petitioner what he had been doing in the Pompei home and petitioner stated that Ms. Pompei's son, Walter, had sent him. Granelli knew that Walter Pompei did not even have a key to his mother's house and so ordered petitioner to wait for the police to arrive. At this point, however, petitioner started to walk towards the alley behind the Pompei garage and Harry Granelli had to struggle with petitioner to stop him. While petitioner was being restrained near the alley, the Granellis testified that he reached under his shirt or the waist of his pants and a crowbar dropped to the ground through one of his pantlegs or from the top of his pants.

When the police arrived, they found everything in order in the Pompei home except in one back room where two metal boxes were found open on the floor and various papers were scattered about. A closet door in the room as well as the drawers of a filing cabinet inside the closet were also open. Upon further examination, it was discovered that the area around the doorjamb on Ms. Pompei's front door was splintered and that there were "pry marks" about one-half inch deep. At petitioner's trial, a police laboratory specialist testified that Ms. Pompei's front door had obviously been pried open with a tool.

Petitioner has persistently maintained that when he arrived at the Pompei residence, the front door was ajar about four to eight inches and that after he rang the doorbell, called "Eva" several times and received no response, he became concerned for his client's welfare and entered the house. Petitioner asserts that he was inside the home for only a

minute or so and did not touch anything or notice any of the rooms in disarray. He further contends that he was about to leave when he saw Louis Granelli running up the front stairs to the house carrying a gun. Petitioner told the committee that he "took off the back way" because he was "damn scared that he was going to be blamed for something" because of his previous criminal convictions for burglary.[2] According to petitioner, it was as he was going down the back steps of the Pompei home that he "kind of stumbled over" the crowbar and yellow rubber gloves and "kind of turned back and picked them up," although he could not explain why.

The record indicates that petitioner received his B.A. degree from Washington University in St. Louis in 1961 and was studying law at Hastings College of the Law in 1962 when he was indicted on 10 counts of second degree burglary in San Francisco involving the theft of collections of coins and stamps.[3] In accordance with these charges, petitioner pleaded guilty to four counts of burglary. On April 27, 1964, petitioner also pleaded guilty to one count of burglary in St. Louis, in a case involving circumstances similar to those of the burglaries in San Francisco. Subsequent to his release from prison on these various charges, petitioner entered Golden Gate University Law School in 1964, passed the bar examination in 1968 and was admitted to practice law in this state on March 2, 1970.

Petitioner now contends that the facts and circumstances surrounding his conviction of Penal Code section 602.5 do not involve moral turpitude, and that even assuming that such conviction is viewed as involving moral turpitude, the recommended discipline is too severe. Petitioner further alleges that it is improper for this court to review his conviction of Penal Code section 602.5 to determine if the facts surrounding such conviction demonstrate that a burglary was, in fact, committed.

[2]Petitioner's testimony before the committee conflicted with the testimony he gave during his criminal trial that he "took off the back way" because he "got quite scared having somebody run up and peeping in the house."

[3]In describing the nature of petitioner's San Francisco burglaries, the following was set forth in a statement filed by the trial judge and district attorney pursuant to Penal Code section 1203.01 on December 20, 1962: "The method of operation was almost identical in each instance. The [petitioner] obtained the name and address of the coin or stamp collector from the club or organizational monthly bulletin and then called the residence to ascertain if the party was at home. If no response, the [petitioner] would go to the address, but would make a second call by telephone within a block or so of the particular residence. If no answer, the [petitioner] would enter the premises and burglarize the same, sometimes taking other items besides coins and stamp collections. . . ."

Although the burden is upon one seeking a review of a recommendation of disbarment to show that the decision is erroneous (Bus. & Prof. Code, § 6083, subds. (a) and (c)), or that the board's finding of moral turpitude is not supported by the evidence (*Lee* v. *State Bar* (1970) 2 Cal.3d 927, 939 [88 Cal.Rptr. 361, 472 P.2d 449]), the question of moral turpitude itself is one of law, the final resolution of which is with this court (*In re Higbie* (1972) 6 Cal.3d 562, 569 [99 Cal.Rptr. 865, 493 P.2d 97]; *In re Alkow* (1966) 64 Cal.2d 838 [51 Cal.Rptr. 912, 415 P.2d 800, 21 A.L.R.3d 882]). It is our duty to independently examine the record, reweigh the evidence and pass on its sufficiency (*Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 220 [113 Cal.Rptr. 175, 520 P.2d 991]). The fact that a jury acquitted petitioner of the charge of burglary and convicted him of the lesser and included offense of unauthorized entry is not conclusive. In examining the circumstances giving rise to an offense, we are not restricted to examining the elements of the crime, but rather may look to the whole course of an attorney's conduct which reflects upon his fitness to practice law. (See Bus. & Prof. Code, § 6106; *In re Higbie, supra,* 6 Cal.3d 562, 572.)

The circumstances surrounding petitioner's presence at the Pompei home belie his assertion that he went there on "pressing" business and entered only when he found the front door ajar and became concerned for his client's well-being. As discussed previously, petitioner was observed "jamming" Ms. Pompei's front door, peering out at Louis Granelli from the front window of the Pompei home and attempting to flee out the back door where he was met by Harry Granelli. Granelli had to physically restrain petitioner after telling him to wait for the arrival of the police who had been called to investigate. When apprehended, petitioner was found with a pair of yellow gloves and a crowbar, the pry end of which was the same width as the instrument which created pry marks on the doorjamb of Ms. Pompei's front door. Furthermore, petitioner's statement to the Granellis that he was at the Pompei home to do some work for Ms. Pompei or her son, Walter, is inconsistent with the explanation he gave at his trial and before the State Bar, that he had gone to the Pompei home to discuss the restaurant sale with Ms. Pompei.

Our independent review of the record indicates that petitioner committed acts in the nature of burglary, that the commission of these acts constitutes moral turpitude and dishonesty and that the protection of

the courts and the integrity of the legal profession require that he be disbarred (*Emslie* v. *State Bar, supra,* 11 Cal.3d 210, 230).

At the hearing before the local administrative committee, petitioner attempted to introduce as mitigating factors the testimony of Ms. Pompei that she had utilized petitioner's services subsequent to the incident on July 1, 1972, as well as the testimony of Robert Dingman, the jury foreman during his criminal trial, that he would not exclude petitioner from consideration if he needed to hire an attorney. The favorable testimony of these witnesses is not conclusive, however. (*In re Jones* (1971) 5 Cal.3d 390, 401 [96 Cal.Rptr. 448, 487 P.2d 1016].) Ms. Pompei was a friend of petitioner's family who also testified that she would do what she could to help him out of a "jam." And while Mr. Dingman testified that prior to his appearance before the committee he was aware of petitioner's previous criminal record, when pressed on cross-examination, he admitted that he had not been aware of petitioner's conviction in Missouri. Furthermore, neither witness provided direct evidence as to petitioner's rehabilitation. (See *In re Hanley* (1975) 13 Cal.3d 448, 454 [119 Cal.Rptr. 5, 530 P.2d 1381].)

The record here shows no evidence of the rehabilitation of petitioner's character following his admission to practice as is evident from the facts and circumstances surrounding his latest conviction. (*Emslie* v. *State Bar, supra,* 11 Cal.3d 210, 230.) Moreover, it is significant that petitioner has failed to show any remorse for his actions (*In re Silverton* (1975) 14 Cal.3d 517, 525 [121 Cal.Rptr. 596, 535 P.2d 724]) and has devoted his efforts to attempting to demonstrate that there was a complete lack of evidence of the commission of any crime. (Cf. *Toll* v. *State Bar* (1974) 12 Cal.3d 824, 834 [117 Cal.Rptr. 427, 528 P.2d 35].) Petitioner displayed an obvious lack of candor in testifying at his criminal trial as well as before the committee (*In re Bogart* (1973) 9 Cal.3d 743, 749 [108 Cal.Rptr. 815, 511 P.2d 1167]), offering conflicting testimony as to his purpose in visiting the Pompei home as well as his reasons for attempting to flee the dwelling.

In light of these factors, it appears that disbarment is necessary to protect the public and to maintain public confidence in the courts and the legal profession. Therefore, it is ordered that petitioner be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is also ordered that petitioner comply with rule 955 of the California Rules of Court and that he perform the acts

specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective 60 days after the filing of this opinion.

Petitioner's application for a rehearing was denied August 18, 1976.