[L.A. No. 31489. May 20, 1982.]

In re BILL DAVID SCHWARTZ on Disbarment.

COUNSEL

Victor Sherman and Nasatir, Sherman & Hirsch for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Gael T. Infande for Respondent.

## OPINION

**THE COURT.**—We review a recommendation of the State Bar Court that petitioner Bill David Schwartz be disbarred from the practice of law because of the circumstances surrounding a crime involving moral turpitude and because of his conviction therefor. He challenges the sufficiency of the evidence to support the factual findings of the State Bar Court and claims that disbarment is unwarranted because his conduct did not involve moral turpitude and because of various mitigating circumstances. We conclude otherwise.

Petitioner was admitted to the practice of law on October 22, 1975, and has no prior record of discipline.

On March 14, 1979, petitioner was convicted on his plea of guilty to one count of using a fictitious name for the purpose of conducting by means of the United States Postal Service a scheme to defraud and obtain property by false pretenses. (18 U.S.C. § 1342.) He was sentenced to three years in prison, with sentence suspended on condition that he serve three months at a community treatment center; and he was placed on probation for four years.

On March 22, 1979, we determined that the offense for which petitioner was convicted involved moral turpitude and placed him on interim suspension. (Bus. & Prof. Code, § 6102, subd. (a).) Thereafter we referred the matter to the State Bar for a hearing, report and recommendation as to discipline. (*Id.*, § 6102, subd. (c).)

On December 19, 1980, a State Bar hearing panel unanimously recommended that petitioner be disbarred. On June 16, 1981, the review department of the State Bar Court confirmed that recommendation by an 11-to-3 vote. (Two of the dissenters recommended a five-year suspension; the third, an "extended" one.)

The State Bar found that petitioner was involved with others during the period from June 3, 1977, to November 20, 1977, in a complex scheme to obtain merchandise from various companies by fraudulent

means. The bar noted petitioner's claim that he had engaged in the plan as a means to recover approximately $15,000 which he asserted had been obtained from him fraudulently by an acquaintance, Ronald Levin, who subsequently was a codefendant in the criminal proceedings against petitioner.

We summarize the principal details of the scheme. In June 1977 Levin contacted petitioner, proposing that they form a company, QST Industries, Inc. (QST), which would order large quantities of merchandise and sell the goods cheaply for a quick profit. To establish a line of credit permitting the purchases, false credit information was generated through the creation of fictitious entities; the appearance of authenticity was achieved by opening bank accounts in the names of the fictitious entities and by establishing telephone answering and mail receiving services for them.

Petitioner agreed to assist in the creation of the false credit information. To that end, using an illegally obtained driver's license which bore a fictitious name—"David Grindeland"—petitioner opened a bank account in the name of "Hillman Manufacturing Company" and signed the bank signature card with the name "David Grindeland." Petitioner was fully aware that no such company existed. In like fashion, petitioner established a mail receiving service in the name of another fictitious company, "Southwestern Holding Corporation," by executing a postal service form in the name of "David Grindeland, President." Each of these companies provided false credit information on behalf of QST.

In October 1977 petitioner used a $2,066.25 check drawn on the account of QST to pay for chrome plating done on his automobile, presenting to the payee a QST business card and representing himself to be "David Grindeland," attorney for a division of QST's business. The check was issued to help establish QST's credit. Payment was stopped on the check and the payee was not compensated by petitioner until February 1979, almost a year after a 24-count indictment was returned against petitioner and others in the United States District Court alleging the fraudulent scheme.

Petitioner also knowingly obtained, in furtherance of the scheme, false corroboration of QST's good credit from an acquaintance, Frank Stamps, who was employed by an automotive parts company. Apparently, petitioner's participation in the fraudulent scheme did not extend to the actual acquisition of any merchandise, but was limited to the es-

tablishment of a false credit rating. It is significant, however, that when first questioned by postal inspectors, petitioner denied all knowledge of the scheme, of QST and of the name "David Grindeland." He admitted his involvement only after he was identified·as "Grindeland" by bank employees.

■ Petitioner argues that the evidence does not support most of the State Bar's findings of fact, including the finding that he was aware of the illegality of the QST scheme. In support of that contention, petitioner challenges the testimony of a United States postal inspector who related several interviews he had with petitioner both before and after the latter's indictment. According to the inspector, in those interviews petitioner admitted his involvement in the creation of the above mentioned fictitious entities and others. Other evidence, including that of a fingerprint and handwriting analyst, corroborated that connection.

While contradicting the postal inspector's testimony concerning his admission of knowing involvement in an illegal scheme, petitioner freely admitted the following: his participation in the merchandising enterprise with Levin, who earlier had defrauded petitioner of $15,000, signing the fictitious name "David Grindeland" and using a QST business card when paying for chrome plating of his automobile with a QST check, signing the "Grindeland" name and using a "Grindeland" driver's license to open a bank account for the fictitious "Hillman Manufacturing Company," and using the pseudonym in connection with certain collection work which he did. Petitioner further acknowledged that he knew the Hillman account was to be used as a credit reference for QST and that his representation on the bank signature card that "David Grindeland" was the president of Hillman was false. While claiming that he had become "uneasy about what was going on" in August 1977 and "wanted to get out of this whole thing," petitioner admitted using the QST check two months later to "help establish credit for QST." With respect to his solicitation of Stamps in the scheme, petitioner freely acknowledged that Stamps' function was falsely to represent to third parties that his company was doing business with QST in order to vouch for QST's credit with those parties.

It is apparent from the findings of the State Bar Court that petitioner's disclaimer of a knowing involvement in the fraudulent scheme was not credited, and petitioner bears the burden of showing that those findings are not supported by the evidence. (*Gallagher* v. *State Bar* (1981) 28 Cal.3d 832, 837 [171 Cal.Rptr. 325, 622 P.2d 421]; *Ramirez* v.

*State Bar* (1980) 28 Cal.3d 402, 411 [169 Cal.Rptr. 206, 619 P.2d 399].) In our view, petitioner has not sustained that burden. To the contrary, upon our independent review of the record (see *In re Conflenti* (1981) 29 Cal.3d 120, 124 [172 Cal.Rptr. 203, 624 P.2d 253]; *Marcus* v. *State Bar* (1980) 27 Cal.3d 199, 201 [165 Cal.Rptr. 121, 611 P.2d 462]) we conclude that those findings are fully supported by the weight of the evidence as well. Petitioner's own admissions, including the conclusive evidence of his guilt of the federal offense of which he was convicted on his guilty plea (see Bus. & Prof. Code, § 6101; *In re Dedman* (1976) 17 Cal.3d 229, 231 [130 Cal.Rptr. 504, 550 P.2d 1040]), clearly establish his culpability.

Petitioner's further contention that his conduct does not involve moral turpitude is frivolous. He was convicted of the use of a fictitious name to defraud. Fraud is a principal element of moral turpitude (see *In re Higbie* (1972) 6 Cal.3d 562, 573 [99 Cal.Rptr. 865, 493 P.2d 97]; *In re Hallinan* (1954) 43 Cal.2d 243, 247 [272 P.2d 768]), and he offers no authority to dispute our earlier determination that his offense here involved moral turpitude.

■ Petitioner contends that disbarment is not warranted by his actions when they are viewed in the light of various mitigating considerations. While all relevant factors, including those in mitigation, must be considered in determining the appropriate discipline (*Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 514 [153 Cal.Rptr. 24, 591 P.2d 47]), petitioner has failed to demonstrate the impropriety of the discipline recommended by the State Bar for the protection of the public, the courts, and the legal profession itself. (See *Crane* v. *State Bar* (1981) 30 Cal.3d 117, 123-124 [177 Cal.Rptr. 670, 635 P.2d 163]; *In re Petty* (1981) 29 Cal.3d 356, 360 [173 Cal.Rptr. 461, 627 P.2d 191].)

We afford little weight to his lack of any prior disciplinary record because he had been practicing only two years before he became involved in the illegal scheme. (See *In re Petty, supra,* 29 Cal.3d at p. 361.) Nor does his subsequent cooperation with the prosecuting authorities carry much weight when it is noted that it was not extended until his arrest, and only then, in consideration for the government's dropping 23 counts of the indictment against him.

Petitioner asserts as an additional mitigating circumstance the fact that his misconduct was not perpetrated in his professional capacity. Correctly observing that the purpose of disciplinary proceedings is not

primarily to punish a practitioner, but rather to protect society from attorneys who are not fit to practice law (see *In re Petty, supra*, at p. 360), he errs in assuming that such unfitness can be identified only when demonstrated in the conduct of his legal practice. Discipline is properly imposed for acts involving moral turpitude, whether or not the acts were performed by an attorney in his professional capacity. (See *In re Bogart* (1973) 9 Cal.3d 743, 749 [108 Cal.Rptr. 815, 511 P.2d 1167].)

Petitioner's final argument in mitigation of his conduct is that his postconviction behavior demonstrates both remorse and rehabilitation, as confirmed by favorable letters from his probation officer and another attorney who has known him for many years. In response, the State Bar stresses petitioner's failure truthfully to acknowledge his previous application for a driver's license in the name of "David Grindeland" when he sought a new license *after* his federal conviction.

We neither doubt that petitioner regrets his past criminal conduct and the consequences thereof nor have reason to dispute the character testimony to that effect. As we recently stated, however, "Remorse does not demonstrate rehabilitation . . . . In our view, a truer indication of rehabilitation will be presented if petitioner can demonstrate by his sustained conduct over an extended period of time that he is once again fit to practice law . . . . Petitioner will have an additional opportunity hereafter to demonstrate his fitness in reinstatement proceedings before [the State Bar]." (*In re Conflenti, supra*, 29 Cal.3d 120, 124-125.)

Upon findings supported by the weight of the evidence, the State Bar recommends petitioner's disbarment. Such discipline frequently has been found appropriate where, as here, an attorney is convicted of a crime involving moral turpitude. (See *In re Bloom* (1977) 19 Cal.3d 175 [137 Cal.Rptr. 168, 561 P.2d 258]; *In re Hurwitz* (1976) 17 Cal.3d 562 [131 Cal.Rptr. 402, 551 P.2d 1234]; *In re Weber* (1976) 16 Cal.3d 578 [128 Cal.Rptr. 434, 546 P.2d 1378]; *In re Silverton* (1975) 14 Cal.3d 517 [121 Cal.Rptr. 596, 535 P.2d 724]; *In re Wright* (1973) 10 Cal.3d 374 [110 Cal.Rptr. 348, 515 P.2d 292]; *In re Bogart, supra*, 9 Cal.3d 743.) We find that the record amply supports petitioner's disbarment.

For the foregoing reasons it is ordered that Bill David Schwartz be disbarred from the practice of law in this state and that he comply with

rule 955(a), of the California Rules of Court within 30 days of the effective date of this order, and with subdivision (c) of that rule within 40 days of such effective date. This order is effective 30 days after the filing of this opinion.