[No. S007499. Aug. 7, 1989.]

In re LAURA BETH LAMB on Disbarment.

240

COUNSEL

Dennis A. Fischer, Alan S. Yockelson and Tom Low for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Ellen R. Peck and William F. Stralka for Respondent.

OPINION

**THE COURT.**—Petitioner Laura Beth Lamb was admitted to practice in December 1983. She has no prior record of discipline. On November 13, 1986, she pled nolo contendere to two felony counts of false personation to obtain a benefit. (Pen. Code, § 529, subd. 3.) The charges arose from allegations that petitioner took the July 1985 bar examination for her husband.

Upon receiving the record of conviction, we referred the matter to the State Bar for a determination whether the misconduct involved moral turpitude and, if so, what discipline should be imposed. Among other things, the parties stipulated before the State Bar Court that moral turpitude was involved. The hearing officer proposed disbarment, and the review department concurred. Petitioner sought review.

Petitioner's case has sympathetic aspects, and her expressions of contrition seem genuine. Nonetheless, her deceitful crime was exceptionally

serious. Considering the public danger inherent in bar exam cheating, and the criminal dishonesty and moral turpitude involved, "[o]nly . . . the most compelling mitigating circumstances" could prevent disbarment. (See Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 3.2.)[1] Moreover, despite her intellectual promise, the psychological problems which led to petitioner's moral misjudgment cast continuing doubt upon her fitness to practice law. Under the circumstances, we adopt the State Bar Court's proposal and disbar petitioner.

## FACTS

Before the State Bar Court, the parties stipulated as follows: Petitioner posed as her husband Morgan Lamb in a photograph submitted to the State Bar as identification for the July 1985 bar examination. She later appeared at the examination and represented herself as her husband. To avoid detection, she deliberately smeared her thumbprint and forged her husband's signature on the admission card. Petitioner then took the examination in her husband's place, signing his name on the examination booklets. She passed the examination. An anonymous telephone tip to the State Bar in November 1985 triggered an investigation which led to the current proceeding. The stipulation concedes that petitioner's misconduct involved moral turpitude and constituted a willful violation of her oath and duties as an attorney. (Bus. & Prof. Code, §§ 6068, 6103, 6106.)

The record further discloses that in November 1986, the Los Angeles County District Attorney's office filed an 18-count felony complaint against petitioner. Petitioner agreed to plead nolo contendere to two charges of felony false personation. In March 1987, she was sentenced to a $2,500 fine and three years' probation on various conditions. Under the terms of her probation, she was to perform 200 hours of community service, continue therapy under supervision of the probation department, and refrain from law practice "unless properly licensed by the state of California." In October 1987, the superior court reduced the felony convictions to misdemeanors.

By further stipulation, documentary evidence originally presented to the criminal court on the issue of sentence was introduced in the State Bar disciplinary proceeding for purposes of mitigation. These documents indicate that petitioner's troubled background led her to value family life and marital harmony at all costs. From 1983 to 1985, after their graduation from law school, petitioner's husband suffered a series of professional

---

[1] The State Bar's Standards for Attorney Sanctions for Professional Misconduct, effective January 1, 1986, are hereafter identified simply as the "Standards."

setbacks, including loss of employment and bar exam failures in both Texas and California. He reacted with violent rage and depression, and the marriage deteriorated rapidly. Meanwhile, petitioner became pregnant in late 1984. Her pregnancy and general health were endangered by serious complications of her chronic diabetes. The confluence of emotional and physical stress caused petitioner to conclude that her only hope for her unborn child was to accede to her husband's pleas that she take the July 1985 exam in his place.[2]

After her arrest in April 1986, petitioner was fired from her position as an enforcement attorney for the Securities and Exchange Commission. Petitioner initially sought a new job as a lawyer, but ultimately refrained from law practice after her arrest. Petitioner works as a legal secretary. She and her husband are now divorced.

After petitioner's arrest, her criminal counsel referred her to a psychiatrist, Dr. Faerstein, for evaluation and treatment. Dr. Faerstein saw her on three occasions, for a total of five and one-half hours, between May and July 1986. In a February 1987 letter to the superior court, he opined that petitioner's immature personality and physical illness led her to have unrealistic goals, deny her marital problems, and make irrational life judgments. According to Dr. Faerstein, petitioner's misconduct stemmed from "a misguided and psychologically pathological attempt" at saving her marriage.

Dr. Faerstein found petitioner genuinely contrite and "amenable to therapy" for her "long-term psychological problems." With an "adequate course of psychotherapy," he concluded, "she may be able to function with sufficient social judgment, restraint and appropriateness as to be able to function as a member of the bar. Such a decision would clearly depend on future opinions from her treating therapist."

In a letter to the court dated February 17, 1987, Francine Bartfield, a licensed clinical social worker, stated that she had been treating petitioner since December 2, 1986. Bartfield confirmed that petitioner was "a confused, socially naive, immature young woman, who [exercised] poor judgment, and acted [not from antisocial motives but from] a distorted notion that she could save her marriage." According to Bartfield, petitioner was contrite, understood her misconduct was "seriously pathological," and was unlikely to "do anything remotely like this again." Petitioner's "prognosis for the future is good," Bartfield wrote, "provided she remains in therapy

---

[2] Though seven months pregnant and seriously ill when she took the exam, petitioner managed to receive the ninth highest score in the state for July 1985. She entered the hospital immediately after completing the exam. When her condition became life-threatening, labor was induced, and a healthy daughter was born prematurely.

long enough to develop the psychic structures that have not, yet, matured . . . . This will require a long term commitment . . . ."

Finally, the stipulated record includes letters from relatives, friends, classmates, and professional colleagues. These attest to petitioner's exceptional character, her legal ability, and her life difficulties.

The State Bar Court hearing occurred on November 9, 1987. The parties stipulated to petitioner's completion of 132 community-service hours during the first 6 months of her probation. Without objection, petitioner's counsel stated that a letter recently submitted to the criminal court in support of the application for reduction of charges, which letter "your Honor will read," indicated "that [petitioner] had been involved in therapy [as previously ordered] over this period of time [i.e., from the March 1987 sentencing hearing to the October 1987 application for reduction of charges], . . . and that she's progressing well . . . ." In a brief statement, petitioner declared, "I just want to assure you that I'm sorry for what happened, and I wish I could have thought of a better way to handle my problems, but at the time, I just couldn't, and I'm so sorry."

The hearing officer issued his decision on January 25, 1988. In recommending disbarment, the hearing officer reasoned as follows: Because petitioner had committed crimes involving moral turpitude, disbarment was required unless "the most compelling mitigating circumstances clearly predominate . . . ." (Std. 3.2.) In aggravation, the case involved multiple acts of wrongdoing or demonstrated a pattern of misconduct (std. 1.2(b)(ii)), involved dishonesty and concealment (std. 1.2(b)(iii)), and significantly harmed the public and the administration of justice (std. 1.2(b)(iv)). While petitioner's "predicament" was "extreme," her emotional inability to see "ethical options" endangered the public.[3] Despite petitioner's need for long-term treatment to overcome her emotional problems, there was no evidence she had committed "voluntarily" to therapy or had continued it after termination of her probation condition. Hence, mere suspension with a therapy condition would not adequately protect the public.

On February 8, 1988, petitioner moved to reopen proceedings before the hearing officer and to submit additional evidence of her commitment to therapy. (Rules Proc. of State Bar, rule 562.) The motion was denied.

---

[3] In the hearing officer's view, "She could have gone to a battered women's shelter or to any of the persons who wrote letters on her behalf, including her mother, her father, or her sister, for advice, shelter, and, if necessary, for protection against her husband. Her expressed motivation for the impersonation, the protection of her unborn child, is most noble, but placing herself under the stress of the impersonation actually endangered the health of the fetus, as she admits. . . ."

In order to avoid an application by the State Bar examiner for her involuntary enrollment in inactive status pending final disciplinary action (Bus. & Prof. Code, § 6007, subd. (c)(1), (2), (4)), petitioner stipulated to inactive status. The stipulation was approved by the State Bar Court and became effective on April 10, 1988.

On August 2, 1988, the review department unanimously adopted the hearing officer's disbarment recommendation. This petition followed.

## DISCUSSION

The only issue is the appropriate discipline. ▪ On that score we must examine the record independently and exercise our own judgment. (*Lawhorn* v. *State Bar* (1987) 43 Cal.3d 1357, 1365 [240 Cal.Rptr. 848, 743 P.2d 908]; *Tarver* v. *State Bar* (1984) 37 Cal.3d 122, 132 [207 Cal.Rptr. 302, 688 P.2d 911].) However, the State Bar Court's recommendation is entitled to great weight; petitioner bears the burden of demonstrating it is unwarranted or erroneous. (*Guzetta* v. *State Bar* (1987) 43 Cal.3d 962, 981 [239 Cal.Rptr. 675, 741 P.2d 172, 65 A.L.R.4th 1]; *Warner* v. *State Bar* (1983) 34 Cal.3d 36, 43 [192 Cal.Rptr. 244, 664 P.2d 148].)

Here, moreover, the recommendation stems from application of the recently adopted Standards. ▪ These guidelines are not binding on us, but they promote the consistent and uniform application of disciplinary measures. Hence, we have said that "we will not reject a recommendation arising from application of the Standards unless we have grave doubts as to the propriety of the recommended discipline. . . ." (*Lawhorn, supra,* 43 Cal.3d at p. 1366.)[4]

▪ We have no such doubts here. As the State Bar Court observed, the Standards propose disbarment for crimes involving moral turpitude unless "the most compelling mitigating circumstances clearly predominate . . . ." (Std. 3.2.) Moreover, that the member's misconduct "was surrounded by . . . bad faith, dishonesty, [or] concealment," and that it "harmed significantly . . . the public or the administration of justice" are aggravating circumstances. (Std. 1.2(b)(iii), (iv).)

Petitioner's deceitful acts were of exceptional gravity. Her conduct threatened innumerable clients with significant injury through unknowing

---

[4]Petitioner complains that the Standards, effective only on January 1, 1986, were applied to conduct in her case which occurred before that time. However, we have held that nothing akin to an ex post facto problem is presented by application of the Standards to attorney misconduct which occurred before their effective date. (*Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550-551 [237 Cal.Rptr. 168, 736 P.2d 754].)

exposure to an unqualified practitioner. It undermined the integrity of the State Bar's admission system, on which public confidence in the competence of attorneys is founded. Substantial harm to "the public [and] the administration of justice" (std. 1.2(b)(iv)) was averted only by an anonymous tip. And, though it did not directly occur in petitioner's "practice" of law, her misconduct evidenced her disregard of the State Bar's admission rules and directly "relate[d]" to her obligations as an attorney. (Cf. std. 2.3.)

As the State Bar suggests on review, because petitioner's criminal breach of professional standards was so morally serious and so dangerous, only the most overwhelming evidence of mitigation could prevent her disbarment in the public interest. Petitioner fails to sustain that heavy burden.

Petitioner urges that her misconduct stemmed from overwhelming physical and psychological pressures. The Standards provide that "extreme emotional difficulties or physical disabilities" at the time of the misconduct may sometimes serve as mitigating circumstances. However, because of the need for public protection against unfit practitioners, a member subject to discipline must first establish "through clear and convincing evidence that he or she no longer suffers from such difficulties or disabilities." (Std. 1.2(e)(iv).) Considering the magnitude of petitioner's misconduct, and its pertinence to her fitness as an attorney, proof of her complete and sustained recovery and rehabilitation must be exceptionally strong. (See std. 1.2(e)(viii).)

We find no such proof here. Petitioner claims the State Bar Court ignored up-to-date evidence of her sincerity and continuing progress in therapy.[5] However, professional evaluations conducted the previous year uniformly found a *guarded* prognosis dependent on a *long-term* treatment program. Though replete with testimonials to her talent and general character, the record contains, and petitioner submitted, no "clear and convincing" indication of petitioner's *sustained and complete* rehabilitation from chronic personal problems which led to her catastrophic misjudgment. (See *In re Conflenti* (1981) 29 Cal.3d 120, 124-125 [172 Cal.Rptr. 203, 624 P.2d 253].) ■ ■ ■ ■ Thus we, like the State Bar Court, cannot be sure of petitioner's ability to avoid comparable mistakes in her future practice.[6]

---

[5] As noted above, the hearing officer denied petitioner's posthearing motion to submit additional evidence of commitment to therapy. Petitioner's counsel claims no documentary evidence "updating" petitioner's progress was presented at the hearing itself because it was assumed that the oral "stipulation" to that effect (see discussion, *ante,* at p. 244) would suffice. However, it appears that documentary evidence was omitted by the oversight of petitioner's counsel; in the oral stipulation, counsel referred merely to a "letter" or "letters" which "your Honor will read." (*Ibid.*)

[6] Petitioner notes cases in which we have considered personal, psychological, or physical problems in mitigation without requiring complete recovery or rehabilitation. (E.g., *Frazer* v.

Petitioner emphasizes that she has ended the marriage which contributed to her acute stress. She also points out that diabetes, though sometimes controllable, cannot be cured. Thus, she urges, she has done everything possible to eliminate the causes of her misconduct.

However, the consensus of mental health professionals was that petitioner suffered a *chronic emotional disability, independent* of her marital and physical problems, which contributed substantially to her disastrous misjudgment. As noted, we have no convincing evidence that her susceptibility in this regard has ended.

Petitioner appends to her reply brief *in this court* a letter *to us,* dated December 10, 1988, from Francine Bartfield. Bartfield reports that she continued to treat petitioner weekly until July 1988, when loss of insurance coverage forced petitioner to seek less expensive psychological counseling. Bartfield's letter claims petitioner participated sincerely in therapy, gained insight, made personality changes which ensure her misconduct will not recur, has an "excellent" prognosis, and appears fit to practice law "in an ethical and lawful manner." Bartfield states her understanding that petitioner remains in counseling and has no plans to terminate her treatment.

■ In general, this court does not consider evidence other than that which was before the State Bar Court. ". . . We are particularly wary of extrinsic evidence consisting of 'opinions about petitioner's mental attitude [that are] based largely on petitioner's own out-of-court statements. Such evidence is virtually impossible to evaluate in the absence of cross-examination.' (*In re Possino* (1984) 37 Cal.3d 163, 171 [207 Cal.Rptr. 543, 689 P.2d 115], fn. omitted.) [Bartfield's December 1988 letter is] inherently unreliable under this test. The [letter merely reflects] personal beliefs in petitioner's . . . recovery, and [is] based exclusively upon conversations or interviews with [her]. . . ." (*Rosenthal* v. *State Bar* (1987) 43 Cal.3d 658, 663 [238 Cal.Rptr. 394, 738 P.2d 740]; see also *Lydon* v. *State Bar* (1988) 45

State Bar (1987) 43 Cal.3d 564, 576-581 [238 Cal.Rptr. 54, 737 P.2d 1338] [agoraphobia]; *Chasteen* v. *State Bar* (1985) 40 Cal.3d 586, 592-593 [220 Cal.Rptr. 842, 709 P.2d 861] [alcoholism].) The only *criminal-conviction* case cited, however, *In re Nadrich* (1988) 44 Cal.3d 271 [243 Cal.Rptr. 218, 747 P.2d 1146], involved circumstances not present here. In 1982, Nadrich sustained a federal conviction for distributing LSD in interstate commerce. While serious, Nadrich's conduct was thus less closely related to his honesty, oath, and duties as an attorney than petitioner's here. Moreover, evidence showed that Nadrich became a drug courier to subsidize his *involuntary,* medically-induced Percodan addiction. He had continued in psychotherapy *since 1982,* and had abstained from drugs for the *intervening six years.* Our case law generally supports the view that physical, mental, or emotional problems do not excuse, and may indeed require, discipline necessary for the protection of the public. (See, e.g., *Palomo* v. *State Bar* (1984) 36 Cal.3d 785, 797 [205 Cal.Rptr. 834, 685 P.2d 1185]; *Snyder* v. *State Bar* (1976) 18 Cal.3d 286, 293 [133 Cal.Rptr. 864, 555 P.2d 1104]; *Grove* v. *State Bar* (1967) 66 Cal.2d 680, 685 [58 Cal.Rptr. 564, 427 P.2d 164].)

Cal.3d 1181, 1187 [248 Cal.Rptr. 830, 756 P.2d 217]; *In re Ford* (1988) 44 Cal.3d 810, 818 [244 Cal.Rptr. 476, 749 P.2d 1331]; but see *Doyle* v. *State Bar* (1976) 15 Cal.3d 973, 980, fn. 2 [126 Cal.Rptr. 801, 544 P.2d 937].)

■ In any event, considering the magnitude of petitioner's transgression, the 1988 Bartfield letter is insufficient evidence of her recovery. The legal, ethical, and moral pressures of daily practice come in many forms. Besides raw avarice and self-aggrandizement, they may include the sincere but misguided desire to please a persuasive or overbearing client. (See, e.g., *Snyder, supra,* 18 Cal.3d 286.) Petitioner's proffered evidence fails to demonstrate the sustained recovery which would satisfy us of her ability to withstand such stresses.

Petitioner appears to exhibit genuine remorse, and she presents numerous testimonials to her integrity. The parties stipulate to her candor and cooperation in the State Bar investigation. These factors may be deemed mitigating in appropriate circumstances. (See std. 1.2(e)(v), (vi), (vii).) Her youth and her apparent absence of antisocial motive also weigh in her favor.[7] Considering the seriousness of petitioner's misconduct, however, this evidence is not sufficient to overturn the disbarment recommendation absent a showing of complete and sustained rehabilitation. (See *Conflenti, supra,* 29 Cal.3d at pp. 124-125.)

Despite our sympathetic feelings, our paramount duty is to protect the public, the courts, and the profession. Accordingly we, like the State Bar Court, believe that reinstatement proceedings are the means by which petitioner should demonstrate her clear rehabilitation after "the passage of considerable time." (Std. 1.2(e)(viii).) We therefore adopt the State Bar Court's recommendation that petitioner be disbarred.

■ We realize, of course, that as a direct result of these proceedings, petitioner has been under a legal disability to practice law since April 10, 1988. She stipulated to inactive status, effective on that date, after the hearing officer's disbarment recommendation opened the way for the State Bar examiner to seek involuntary inactive status pending final determination of the disciplinary case.[8] (Bus. & Prof. Code, § 6007, subd. (c)(1), (2),

---

[7] On the other hand, the absence of a prior disciplinary record counts for little where, as here, the attorney has been in practice only a short time and the current misconduct is serious. (E.g., *In re Schwartz* (1982) 31 Cal.3d 395, 400 [182 Cal.Rptr. 640, 644 P.2d 833, 26 A.L.R.4th 1077]; std. 1.2(e)(i).) Nor is petitioner's community service, imposed as a condition of probation, a substantial mitigating factor.

[8] Petitioner has not practiced since her April 1986 arrest on the criminal charges. However, she was under no legal disability to practice until April 10, 1988. The record of her criminal conviction was filed with this court in late 1986, but we did not place her on interim suspension. The terms of her criminal probation, imposed March 11, 1987, include a condition that

(4).) Under the stipulation, petitioner may not regain active status except by the terms of our final order herein.

The Rules of Procedure of the State Bar specify that a petition for reinstatement may not be filed "within five years after the effective date of *interim suspension* or disbarment or resignation whichever first occurred . . . ." (Rule 662, Rules Proc. of State Bar, italics added.) Though petitioner suffered no "interim suspension" in the technical sense, her acquiescence to inactive enrollment was of similar import.

Moreover, rules governing State Bar procedures do not limit this court's inherent authority to fashion an appropriate discipline. (Bus. & Prof. Code, § 6087.) Under the circumstances, and in furtherance of the policy that disbarred attorneys should receive "credit" against the reinstatement period for any related interim ban on practice, we conclude that petitioner may obtain such credit for the period of her enrollment in inactive status.

■■■ It is ordered that Laura Beth Lamb, also known as Laura Beth Salant, be disbarred and that her name be stricken from the roll of attorneys in this state. It is further ordered that petitioner comply with the requirements of rule 955 of the California Rules of Court and that she perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, of the effective date of this order. (See also Bus. & Prof. Code, § 6126, subd. (c).) The five-year limit on filing of an application for reinstatement shall be measured from April 10, 1988, the effective date of petitioner's enrollment in inactive status. This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)

KAUFMAN, J.—I dissent. There was public danger inherent in petitioner's serious misconduct, but the circumstances that gave rise to that misconduct were unique and no longer exist. Contrary to the majority's premise, there is no danger to the public or anyone else from petitioner's one-time, aberrational conduct stemming from circumstances that no longer exist and as to which there is not the slightest possibility of recurrence. Thus, while disbarment in this case will doubtlessly be applauded in some circles, it is wholly unwarranted. It serves only to punish an apparently talented lawyer whose misconduct resulted from the most desperate, life-threatening circumstances. Indeed, such drastic discipline serves the public interest *less* well than would a long period of probation on appropriate conditions, including proof of fitness before returning to the practice of law.

---

she refrain from law practice "unles properly licensed by the state of California." But since she remained on active status, and was neither suspended nor disbarred, during the period from March 11, 1987, to April 10, 1988, her "license" to practice remained intact. Her practice of law during that period would not have violated her probation.

The record discloses the following uncontroverted facts: After adamantly refusing several times her then-husband's insistent demands that she take the bar examination for him, petitioner eventually did so only when she was so desperately physically ill and overwhelmingly mentally intimidated by his barbaric threats and conduct that she felt she had no alternative but to do so, or lose the unborn child with which she was then many months pregnant. The child has long since been born and petitioner's marriage to her former husband has been dissolved. The circumstances were absolutely unique and could not possibly recur.

Petitioner is an insulin-dependent diabetic. When she became pregnant, her physician advised her the pregnancy and its anticipated complications would be life threatening and recommended that she have the pregnancy aborted. She refused. What ensued was nightmarish.

The physician's predictions proved all too true. Petitioner's pregnancy was extremely difficult and provoked severe complications of her diabetes, resulting in substantial, even life-threatening risks to her and her unborn child.

Hormonal changes because of the pregnancy made petitioner's diabetes difficult to control. Yet the doctors told petitioner that inadequate control could result in an overly large baby or render the mother unable to properly nourish the baby. Petitioner was compelled to maintain a strict dietary regimen and to undergo multiple blood tests and insulin injections each day; still, she was unable to achieve control of her diabetic condition. The unstable diabetes produced a toxic substance, acetone, in petitioner's body. She became so weak and dizzy she could hardly hold her head up. Petitioner's physicians told her that the heavy levels of acetone in her body could cause severe spinal deformities or other handicapping or fatal defects in the baby.

Petitioner developed toxemia and proteinuria, both kidney malfunctions, early in her pregnancy. Toxemia raises the blood pressure and can kill the mother, or the fetus, or both. Petitioner's blood pressure was elevated to dangerous levels for both her and her child.

Proteinuria caused her kidneys to over-eliminate protein from the body, depriving it of needed nourishment for herself and the fetus. Petitioner was required to lie still and not to exert herself to avoid expending her slender protein resources. The proteinuria also resulted in massive edema (swelling). Petitioner's legs became so swollen that her skin was split and bleeding. Her attending physicians feared the swelling would enter the womb and threaten the life of the fetus. The proteinuria further exacerbated petitioner's already dangerously high blood pressure. To alleviate the proteinuria,

petitioner entered the hospital to receive intravenous blood protein. She also required two blood transfusions.

Petitioner was also hospitalized numerous times during her pregnancy because of uncontrollable vomiting and a dangerous insulin reaction.

In addition, petitioner suffered from proliferative diabetic retinopathy, a condition which causes hemorrhaging of blood vessels in the eyes and can result in blindness. The pregnancy further weakened the blood vessels in petitioner's eyes and increased the risk of blindness.

The complications of the pregnancy not only stripped petitioner of her physical resources, but the extreme stress of the pregnancy, her inability to control her diabetes, and the effects of the acetone, high blood pressure and protein deficiency fundamentally affected petitioner's mental and emotional health as well. She lived in fear that as a result of the pregnancy there was a good chance that she would become blind, the baby would be severely handicapped, or that death would result for either petitioner, the baby, or both. In short, petitioner was mentally and emotionally distraught and confused.

In addition to the overwhelming physical and emotional problems of her pregnancy, petitioner's marriage and home life had become nothing short of a disaster.

Petitioner had met Morgan Lamb in law school. In 1983, after their graduation from law school, Morgan accepted employment at a prestigious law firm in Houston. Petitioner joined Morgan in Houston and they were married in October 1983. After passing the California bar examination, petitioner was hired as an attorney in the Houston office of the Securities and Exchange Commission (SEC). Soon after, however, things began to fall apart.

Morgan failed the Texas bar examination. He began to act depressed and moody. He would cry, hide in bed, or watch television. He also became violently argumentative.

Morgan retook the Texas bar examination. He was so convinced he would fail again that he became hysterical. Although he did pass, he was fired by his law firm. His reactions became more extreme, violent and unpredictable. He would shout and throw things, and even abused petitioner physically.

After these setbacks, petitioner and her husband attempted a new start. They moved to Los Angeles where Morgan had secured a position with a

prominent law firm. Petitioner was able to transfer to the Los Angeles office of the SEC.

Morgan sat for the February 1985 California bar examination. By this time, petitioner was pregnant and already so ill she had to take a leave of absence from her job. Then, within a short space of time, Morgan was fired from his position with the Los Angeles law firm and he received a letter notifying him that he had failed the California bar examination. After that, he lost any semblance of self-control. He threw heavy objects and furniture. He smashed large lamps and tore down the curtain rods. He screamed at petitioner and pushed her violently. He threatened to kill himself. He threatened to kill petitioner and the baby. Petitioner was so frightened she removed a gun he kept near the bed. Members of petitioner's family who visited her saw broken glass on the floor, smashed lamps, holes in the wall and bits of food plastered on the wall. Petitioner lived in fear of her husband's violent tantrums.

Petitioner desperately wanted to save her marriage and the lives of herself and her baby. The stress of her home situation placed an intolerable stress on the unborn baby because of petitioner's extremely high blood pressure and physical illnesses. Her doctors told her she had to alleviate the stress or risk the life of her baby or herself. Petitioner was required to lie still because of her dangerous protein deficiency. At times, however, Morgan would shake her and force her to get up and do housework and take care of him.

Morgan became convinced he could not pass the bar examination and repeatedly importuned petitioner to take it for him. She refused numerous times, although she was afraid of what he might do to her or to himself if she did not relent. Each time she refused he would fly into a rage. Finally, in her weak and confused state, petitioner gave in to her husband's demands that she take the exam for him because she could not think of any way to refuse without endangering herself or the baby. She submitted her photograph with his application to take the July 1985 bar examination. Even thereafter, she attempted to convince her husband to take the examination himself and studied with him so that he would be prepared for the examination. For a short time, that plan seemed to be working, but then Morgan began to find more and more excuses not to study. Ultimately, petitioner succumbed to the overwhelming pressures and took the examination posing as her husband.

Immediately upon completing the bar examination, petitioner entered the hospital, where her doctors urged her to have the baby delivered at once or risk the death of both herself and her baby. Petitioner refused because the baby's lungs were too underdeveloped for it to survive outside her body.

Petitioner underwent experimental treatments to help the baby's lungs develop. She herself was on the verge of death and required intensive care. After 10 days, labor was induced and a healthy baby girl was born, 2 months prematurely.

## DISCUSSION

Petitioner does not claim that her conduct was justified or legally excused by these circumstances. She in fact stipulated her conduct involved moral turpitude and accepts responsibility for it. Rather, the issue is what discipline is appropriate for petitioner's conduct.

In fastening upon disbarment as the appropriate discipline the majority give insufficient consideration to the mitigating circumstances in this case. The majority discount petitioner's evidence in mitigation because they do not find it "clear and convincing" that she no longer suffers from the extreme emotional and physical difficulties which contributed to her misconduct. (Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct, std. 1.2(e)(iv).) They, like the hearing officer and the review department, reach this conclusion on the basis that petitioner's problems require long-term ongoing psychological therapy, and that she has failed to demonstrate a commitment to such counseling.

Petitioner's "long term" psychological problems relate to her childhood in a dysfunctional family where one parent abused drugs and all the family members became withdrawn and isolated. Yet it is uncontroverted that, despite the psychological shortcomings attributable to her past, petitioner had always been able to conform her conduct to the highest ethical standards. The record shows that the conduct leading to this offense was completely aberrational and out of character. It was only in the unique combination of situational circumstances here, in which she was on the verge of complete physical, mental and emotional collapse, that she engaged in these bizarre acts.

Petitioner has shown, not only clearly and convincingly, but beyond question, that she has done everything possible to eliminate the extreme emotional and physical difficulties that led to the misconduct. She is, of course, no longer pregnant and no longer suffers the dire complications brought on by the combination of pregnancy and her diabetes. She has ended her marriage to Morgan Lamb. Though she cannot change the fact of her diabetes, she has brought it under control. And she has committed to voluntary, long-term therapy to overcome her problems. A fair reading of the record shows that the hearing officer had before him significant evidence

that, despite her need for therapy to overcome her past problems, her therapist was of the opinion that it was extremely unlikely that petitioner "will do anything remotely like this again." In addition, petitioner's probation after her criminal conviction was terminated early, based in part on her success in ongoing therapy. The hearing officer's concern that petitioner would not continue in therapy absent the compulsion of probation has been answered. Petitioner has voluntarily continued in therapy after termination of her probation, and she has submitted a letter to this court from her therapist documenting her continued progress in therapy.[1]

The circumstances established by the record are clearly overwhelmingly mitigating and demand a discipline less severe than disbarment. This court has imposed less severe discipline in cases where the mitigating circumstances were far less compelling and where the misconduct was at least as egregious.

In the recent case of *In re Mostman* (1988) 47 Cal.3d 725 [254 Cal.Rptr. 286, 765 P.2d 448], an attorney solicited another person to kill or do bodily injury to a former client. The mitigating circumstances included initial refusals to engage in misconduct, the conduct did not stem from the attorney's practice of law, the attorney was in great emotional distress because he believed the former client had engaged in a campaign of intimidation and harassment against him, and he had been remorseful and cooperative concerning his conviction. Although the attorney had been twice disciplined before, we imposed five years' probation and an actual suspension of two years. In *In re Nadrich* (1988) 44 Cal.3d 271 [243 Cal.Rptr. 218, 747 P.2d 1146], an attorney was convicted of possessing, with intent to distribute, 30 grams of LSD. In mitigation, the attorney's addiction to an opiate-based prescription medication, the abrupt cutting-off of his prescription and his withdrawal from law practice had "create[d] an overwhelming financial pressure." We ordered five years' probation with one-year actual suspension. In *In re Higbie* (1972) 6 Cal.3d 562 [99 Cal.Rptr. 865, 493 P.2d 97], an attorney conspired to smuggle marijuana into the country. We ordered a two-year suspension with one-year actual suspension, rather than disbarment, because the primary motivation for the wrongful behavior was not personal profit (the attorney acted at the insistence of a friend—a pilot—that the attorney help him find employment, but the pilot was really "setting him up" to claim a bounty) and because of the attorney's prior good record. In *In re Kreamer* (1975) 14 Cal.3d 524 [121 Cal.Rptr. 600, 535 P.2d

---

[1] The majority's rejection of this letter is improvident, indeed, inexplicable, in view of the fact the hearing officer's recommendation of disbarment was based almost solely on the alleged lack of demonstrated commitment to therapy, yet he denied petitioner's motion to reopen to submit further evidence on the question.

728], an attorney was convicted of illegal possession of marijuana and of conspiracy to distribute the marijuana. Chronic depression brought on by a breakup with his fiancée led the attorney to use marijuana and to withdraw from his law practice. He turned to drug dealing when faced with mounting debts. We ordered three years' probation and no actual suspension. In *In re Jones* (1971) 5 Cal.3d 390 [96 Cal.Rptr. 448, 487 P.2d 1016], an attorney was convicted of subornation of perjury and submission of false evidence. In mitigation he offered his lack of prior disciplinary record, his previous good reputation, his age (66), his difficulty in securing employment to support his 10-year-old twins, and financial difficulties resulting from his criminal and bar proceedings. We imposed three years' probation with one-year actual suspension. (See also *Frazer* v. *State Bar* (1987) 43 Cal.3d 564 [238 Cal.Rptr. 54, 737 P.2d 1338], in which an attorney committed multiple acts of willful misconduct, abandoning clients to their prejudice, obtaining substantial loans under unfair terms and pursuant to misrepresentations, and ultimately losing the money without making any repayment. On the basis of the attorney's agoraphobia as a mitigating factor we ordered five years' probation with actual suspension for eighteen months and until restitution had been made. In *Maltaman* v. *State Bar* (1987) 43 Cal.3d 924 [239 Cal.Rptr. 687, 741 P.2d 185], an attorney willfully disobeyed important court orders and attempted deliberately to mislead a judicial officer. He also lied on several occasions during his disciplinary proceedings. We imposed five years' probation with one-year actual suspension.)

The failure of this court to accord petitioner in this case at least as favorable consideration is to me inexplicable. Petitioner's conduct here was highly situational and a complete departure from her normal conduct. It resulted from an unfortunate and unique coincidence of circumstances, as to which there is virtually no chance of recurrence. Her actions were devoid of any motivation of venality or baseness.

We have often reiterated that the primary purpose of discipline is the protection of the public, the profession and the courts rather than punishment of the attorney. (*In re Severo* (1986) 41 Cal.3d 493, 500 [224 Cal.Rptr. 106, 714 P.2d 1244].) Disbarment here serves only to punish petitioner. An alternative is available which would, in my view, far better serve the public, the profession and the courts. To the extent necessary, we may impose conditions of probation which will ensure that the attorney is rehabilitated and the public is protected. I would impose a lengthy probation, with a

substantial term of actual suspension and with appropriate probationary conditions, including continued therapy and a demonstration of fitness before returning to the practice of law.