**UNITED STATES of America, Plaintiff,**

v.

**William A. KILPATRICK and Declan J. O'Donnell, Defendants.**

**Crim. A. No. 82–CR–222.**

United States District Court, D. Colorado.

Nov. 2, 1989.

David Barger, Alexandria, Va., Dana Boente, Tax Div., Crim. Section, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

William A. Cohan, Denver, Colo., for defendant Kilpatrick.

Richard Stuckey, Denver, Colo., for defendant O'Donnell.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

MATSCH, District Judge.

During the time relevant to these proceedings, the Internal Revenue Code (IRC) and Internal Revenue Service (IRS) regulations provided opportunities for individual taxpayers to attenuate their income tax liability by investments in programs oriented toward maximizing available deductions. Such programs were known as "tax shelters." Under the canopy of the IRC, an individual in a high tax bracket could invest in an economic activity structured to enable the taxpayer to use business expenses or losses as deductions to reduce the amount of his tax. The criminal charges tried to this court concern the taking of deductions for advance minimum royalty payments pursuant to coal subleases as business expenses under Schedule C to the investors' tax returns and losses from partnerships based on the partnership's research and development expenditures (IRC § 174(a)) reflected in Schedule E to the investor's tax returns.

Counts I and II of the indictment charge the defendants, William A. Kilpatrick (Kilpatrick) and Declan J. O'Donnell (O'Donnell), with conspiring together and with others to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the IRS in the ascertainment, computation, assessment and collection of revenue through false and fictitious claims of deductions for such advance royalty payments and research and development payments in violation of 18 U.S.C. § 371. To obtain a conviction on these charges, the government must prove beyond a reasonable doubt that each of the defendants willfully participated in schemes designed to create false and fictitious tax deductions with the intent to defraud the government. These counts must be considered separately.

## COUNT I—THE COAL LEASING PROGRAM

United Financial Operations, Inc. (UFO) was incorporated in Colorado in 1978 with Kilpatrick as president and sole shareholder. The board of directors included Kilpatrick, O'Donnell and Ms. Sheila Lerner (Lerner). UFO sponsored and administered the coal leasing program which began in 1977 and continued in 1978 and 1979. From the perspective of the investors, the program was the same in all three years. By the payment of $1,000 and an advance minimum royalty payment of $5,625 per unit, the investor became a sublessee of leases of coal properties in Pennsylvania and other states from companies which owned or leased the coal in place. That advance minimum royalty payment was deductible in the year in which it was paid as a business expense for engaging in the coal mining business as a sublessee. To make the investment more attractive, the program provided for a deduction of four times the cash invested by loans to the investors in amounts three times their cash contribution and paid to the lessor coal companies as additional advance minimum royalty payments. The loans were non-recourse loans with repayment solely from the production of coal out of the properties which were the subject of the subleases.

The government does not dispute the availability of deductions from such a program. The charge is that the objective was not to achieve coal production but to create the illusion of that economic activity through a series of sham transactions with circular check writing at its core. In 1977 Arapahoe Dakota, Inc. (ADI) was the coal company subleasing to the investors. For each 1977 investor, P & J Coal Company (P

& J) issued checks in amounts of three times the cash investment to ADI in exchange for the right to mine and market the coal and a non-recourse note from the investor. ADI issued checks to P & J in the same amounts as the checks made on behalf of the investors. All of the check writing took place on December 29, 1977, at the Colfax National Bank. The total of the checks from P & J to ADI was $1,183,-125.00 from a bank account which had $23.95 as the beginning balance. ADI wrote checks to P & J totaling $1,188,-125.00. The president of the Colfax National Bank, Adrian Smith, was present and participated in the exchanges of the checks, and directed that immediate credit be given to the respective accounts. The ADI checks were written on an account which had approximately $70,000 as a beginning balance. Those funds came from investors. The end result can be viewed in alternative ways. In one view, there was a check swap between P & J and ADI with no resulting effect. Each entity was in the same position as at the beginning of the day. Another view is that at the end of the day P & J had obtained the rights to produce coal by borrowing from ADI the amounts paid to it on behalf of the sublessee investors who had obtained those rights by promising to repay ADI when coal was produced. Such a transaction has economic substance.

The 1978 program was larger and more complex. Ten coal company lessors participated. A two-year program was offered. Again, the investors obtained non-recourse financing from P & J to pay the advance minimum royalty payments which exceeded their cash investment. On December 29, 1978, checks were written at the Grand Cayman Islands branch of the Bank of Nova Scotia. The coal companies issued checks to Marlborough Investments, Ltd. (MIL) for a total of $20,836,725.00. MIL was a Cayman corporation beneficially owned by Kilpatrick. MIL issued a series of checks, totalling $20,838,725.00 to Big "C" Companies, Ltd. Big "C" Companies, Ltd. issued a series of checks to P & J for a total of $20,836,725.00 which was also the aggregate sum of the checks from P & J to

the coal companies. Monte Smith, the manager of the branch participated in the exchanges of checks and the making of deposits in the bank on December 29, 1978, which was the last business day of that year. On January 12, 1979, the documentation of the transactions was changed with new checks being issued in different amounts and revised bank statements were prepared. Malcolm Haynes, the Assistant Manager of Operations at the bank, followed the directions of Monte Smith to meet with Kilpatrick and Lerner to make the changes. Essentially he followed a spread sheet given to him by Lerner in revising the bank records. At this time one check was issued by MIL, signed by Mr. Paris to Big "C" in the amount of $18,855,600.00 and Big "C" wrote one check in the same amount to P & J, which issued checks to the coal companies for a total of $18,850,600.00 and the coal companies wrote checks to MIL in the total of $18,845,900.

The investors in the 1978 program made non-recourse notes to P & J together with an assignment of a two-eighths ownership interest in the coal in the ground, a security interest in the remainder of the coal and the right to mine all of the investors' coal. MIL issued a series of debentures to the coal companies in the aggregate amount of $16,150,600.00.

The 1979 program was substantially similar to the 1978 program except that Big "C" Companies, Ltd. was not a participant in the documentation which took place at the Grand Cayman Islands Branch of the Bank of Nova Scotia on December 19, 1979. Another difference was that P & J obtained an option to purchase the investors' coal in exchange for the loans made to pay advance minimum royalties to the coal companies. The flow of checks was $8,927,875.00 in one check from MIL to P & J, several checks in the same amount from P & J to the coal companies and a series of checks from the coal companies to MIL, also aggregating the same amount, $8,927,-875.00.

These coal programs are the subject of Count I of the indictment. The govern-

ment has marshalled substantial evidence to support the charge that the loans made by P & J on behalf of the investors were fraudulent loans for which there was no purpose other than to generate improper tax deductions and that the fraud was concealed through common ownership of the entities involved. P & J was acquired in 1977 from Jack Hill (Hill) who operated a mine through that company in Clearfield County, Pennsylvania. Although the written contract and bill of sale, dated December 23, 1977, recited the sale of Hill's stock to John H. Pettingill for the stated consideration of $3,000, Hill testified that in addition to this cash consideration, there were notes payable to him and other owners to a total of $120,000. Hill said he has not received $50,000 which was payable to him. Hill also said that the financial condition of P & J at the time of the sale was poor and that the company was then "just existing." Kilpatrick had ownership interests in the coal companies, with the exception of a few of those involved in the 1978 program. The 1978 and 1979 "financing" took place in the Grand Cayman Islands beyond the reach of IRS auditors. Big "C" Companies, Ltd. was created as a Bahamian corporation with Oliver Hemphill (Hemphill) as its apparent owner. Hemphill made the connection with the Bank of Nova Scotia as a result of a request from O'Donnell in late December, 1978, for a recommendation of a bank which could complete transactions by the end of the year. Hemphill was known as a consultant on offshore banking. Hemphill testified that he understood that $22,000,000 in cash would be taken to the bank and deposited so that immediate credit would be available. Hemphill as signator for Big "C" signed a blank check on that company's account in the bank and left it with Kilpatrick. That was the check for $18,855,600. For the 1978 transactions, Kilpatrick took less than $400,000 in currency to the bank.

The prosecution relies principally on the circular flow of checks to prove that there was no "real loan" and no "real lender." Clearly, the amounts on deposit in the respective accounts prior to the circulation of these checks were woefully inadequate and the checks written by P & J to the coal companies would not have cleared without the credit from the deposits of the checks made to it. Stated simply, none of the entities participating in the financing had bank accounts to support loans in the amounts required for the investors.

This evidence takes on a somewhat less sinister shade when considered in the light of other facts. Circularity of the checks in the amounts of the bank deposits were well known to the bank officers participating in the financing. We do not have the benefit of the testimony of Adrian Smith or Monte Smith because they are dead. They had apparent authority to commit their banks to the extensions of credit involved in these checks and deposits and the evidence supports a finding that each of them was fully aware of the status of the bank accounts of the participating entities.

The defendants freely distributed offering memoranda outlining the coal program to the public. While there was less than full disclosure, it was made clear that the capital source driving the entire program was the coal reserves controlled by the sublessor coal companies to be mined and marketed by P & J. The subleases were for eight years. The debentures were also payable in eight years by P & J. Assuming the existence of coal in sufficient quantities and assuming appropriate market prices and costs of production it is apparent that there would be a real economic purpose served by an agreement directly between the coal companies and P & J granting P & J the right to mine and market the coal with all payments to be made from the proceeds from the sale of the coal. Examples of the result under various market scenarios are illustrated in the offering memorandum for Cheyenne Coke and Coal Company subleases. Govt. Ex. 24-1. Upon the same assumption of adequacy of the coal reserves, there would be nothing suspicious about the coal companies advancing funds to the producer, P & J, for its operating capital with the loan repayable solely from the coal proceeds. On the evidence before the court, one may conclude that the end result of the year end

financing for each year was a loan from each of the coal companies to P & J repayable from coal proceeds with the purpose of the funds being the payment of advance royalties back to the coal companies. Under that scenario, P & J would be able to deduct the advance royalty payments from any current year income and such a transaction would seem to be appropriate.

The availability of immediate deductions for advance payments on coal to be produced and marketed in a subsequent year, either in the form of advance minimum royalty payments or a carved out production payment provides the purpose for the complex scheme marketed by UFO. It is not a crime to structure simple sale or lease transactions in complex ways for the purpose of minimizing the risk in a new venture by providing tax deductions to sophisticated investors with sufficient incomes to benefit from them. One investor witness testified that he invested knowing the risk of loss of the investment because he was gambling with tax dollars.

The defendant O'Donnell testified at great length at this trial. He wrote the tax opinion that formed a part of the offering memorandum for the coal programs. O'Donnell was not a tax specialist. He had met Kilpatrick through another lawyer, Al Vaughn, who asked O'Donnell if he would represent Kilpatrick on a retainer agreement for various kinds of work. Kilpatrick had been in business with Cal Am in 1977. That company formed limited partnerships to own coal leases as tax shelter investments. Joseph R. Laird, Jr. was a lawyer who was president of Cal Am Corporation. When Kilpatrick wanted to start a similar business, O'Donnell talked with Laird and with Ed Sherman, a lawyer who had a tax opinion letter in the Cal Am offering circular. O'Donnell then made his own study of those sections of the IRC and IRS regulations dealing with carved out production payments. His notes from that study are in evidence as O'Donnell's Exhibit V. O'Donnell testified that his study led him to the conclusion that production from an economically viable coal lease could be financed by a carved out production payment and that an accrual basis taxpayer could

deduct advance minimum royalty payments but that the arrangement must be structured as a cash transaction to make the deduction available to cash basis taxpayers. The check circles were designed by O'Donnell as the method to accomplish that result. In O'Donnell's view of the first financing at the Colfax National Bank, upon the cash deposits by ADI of the monies received from investors, the bank made loans equivalent to the credits given to the payees on insufficient funds checks which loans were then retired by the reciprocal checks.

It is this court's understanding of O'Donnell's testimony that the carved out production payment became a cash transaction in the same way that parties might structure a trade of physical assets through an exchange of checks. Thus, Company A may wish to transfer land valued at $1,000,000 to Company B in exchange for a building worth $1,000,000. Motivated by the need to reflect the exchange in cash for purposes of valuing the property, for tax reasons or other non-fraudulent reasons, a bank could loan Company A $1,000,000 to buy the building from Company B with the understanding that Company B would pay $1,000,000 back to Company A to purchase the land on the same day. Company A then repays the loan to the bank. The funds never left the bank and neither party at the end of the day has a bank balance different from that at the start of the day. In the government's view, that would be a check swap with no economic significance. Yet, if there was also an exchange of deeds, there is no doubt that each party paid $1,000,000 in cash in connection with an economically substantive transaction.

■ Whether O'Donnell's tax opinion is correct is not an issue. Other proceedings in other forums will determine the actual tax consequences of these transactions. What is determinative is that O'Donnell as an experienced business lawyer with an excellent reputation reached the conclusion that this circular financing of a carved out production payment created legitimate tax deductions for the investors and the government's failure to disprove the under-

lying assumption that the coal reserves were adequate to support the values underlying the transaction.

When the government uses the Internal Revenue Code for purposes other than raising revenue thereby inducing particular types of conduct, it is not illegal to be innovative in putting an elaborate dress on prosaic transactions. Leveraged financing and complex investment programs have been commonplace in our economy. What divides a tax shelter from a tax fraud is the existence of some actual economic purpose and what divides civil from criminal liability is the intent of the actor. In pretrial proceedings in this case, the prosecutors articulated the view that it was not necessary for the government to prove that there were no coal reserves or that there was no economic substance to the proposed mining program. Accordingly, the court cautioned defense counsel that their offer of proof of the existence of the coal reserves and the viability of the mining plan would be rejected as irrelevant. It is, of course, the government's burden to prove beyond a reasonable doubt that each of the defendants acted with the intent to defraud the government. The government argues that it has met that burden by demonstrating that each of them participated in the exchanges of checks with knowledge of the insufficiency of the relevant bank accounts; that they concealed the true nature of the financing from the investors; and that they laid a confusing paper trail to make the transactions audit proof.

The failure to disprove the existence of the coal reserves is a fatal flaw in the prosecution's case. O'Donnell testified to his experience as a lawyer, his research into the Internal Revenue Code and regulations and his belief in the legitimacy of the deductions in the coal lease program. He testified that he believed that an economically viable coal lease was the critical element because the coal itself was the only source for repayment of the loans. He testified that the purpose of the check circle was to convert the accrued minimum royalty liability into a deduction which would be available to a cash basis taxpayer. O'Donnell further testified that he per-

sonally inspected coal properties in West Virginia which Kilpatrick acquired in 1978 and that additional properties were acquired in Tennessee. There is no evidence to dispute this testimony concerning the adequacy of the coal reserves. Other defense witnesses testified to the reputation of O'Donnell as a lawyer and as an honest man. In sum, a lawyer with a good reputation investigated the factual support for the coal mining plan, reviewed the financing scheme and gave his opinion to the co-defendant and to the investors that the deductions, while risky, were appropriate. No matter how wrong O'Donnell may have been in his analysis of the tax laws, the evidence is insufficient to find beyond a reasonable doubt that he acted with the requisite criminal intent. The evidence does not support a finding that the co-defendant, Kilpatrick, attempted to mislead O'Donnell, and, accordingly, the evidence is also insufficient to convict Kilpatrick on this count since Kilpatrick relied on O'Donnell's legal opinion.

Additional support for the finding that the defendants did not have the requisite criminal intent is found in the testimony of sophisticated investors. The government called a lawyer and several CPA's who invested in the program. While it is true that they did not have knowledge of the check circles, they were given full opportunity to investigate into the existence of coal reserves and the feasibility of producing coal in the quantities needed for support of the loans.

## COUNT II—THE METHANOL PRODUCTION PROGRAM

Count II of the indictment charges the defendants and others with creation and execution of a second fraudulent tax shelter program. The tax shelter involved the sale of interests in a number of limited partnerships created for the purported purpose of developing processes for the conversion of coal and other carbon-bearing feed stocks to methanol, and to construct plants to carry out the conversion. The rights to the conversion process were owned by International Fuel Development

Corporation (IFDC). In the private placement memorandum used for the marketing of the partnership units, IFDC was described as a Cayman corporation organized in 1979 with its principal asset being the methanol energy license rights to the inventions involved in the process. It was also represented that the company was not owned by any American nationals, that its owners were not related to any other organization or entity involved, and that its financial records were not available. It is clear from the evidence, however, that IFDC, like MIL, was beneficially owned by Kilpatrick. IFDC granted licenses to develop and market the technology in a particular area to the several limited partnerships.

Although there were programs in 1979, 1980 and 1981, the only detailed description of these enterprises in evidence is contained in a private placement memorandum from the 1979 program. According to it, each partnership was divided into 45 limited partnership units which sold for the unit price of $331,111. The purchaser of each unit was required to contribute $12,500 in cash with $137,500 in full recourse promissory notes. The balance of $181,111 was in non-recourse notes, payable from the partnership income, over approximately four years. Accordingly, the capital contribution to each limited partnership was $562,500 in cash, $6,187,500 in recourse notes, and $8,149,995 in non-recourse notes for a total of $14,899,995. From this total, $270,000 was payable to the general partner as commissions which were to be considered R & D expenses. The production facilities were budgeted to cost a total of $5,000,000 per territory.

The tax advantage of the program came from payment of a deductible research and development expense partially with borrowed funds. IFDC agreed to perform research and development work for the partnerships as an independent contractor at a compensation of $2,250,000 payable by the partnership on or before December 31 of the first year and a like amount on or before December 31 of the second year of the program. This sum was a deductible expense of the partnership. MIL agreed to loan the partnership $1,687,500 on or before December 31 of the first year of the program, and the same amount during the second year. These loans were secured by the limited partners' recourse notes. The purchaser of a unit would be able to deduct the proportionate share of the R & D payment, $50,000 in the first year, even though only $12,500 had been paid in cash.

Another integral part of the program was IFDC's right to buy an option to purchase each of two plants for an amount equal to cost plus 100%. The price of the option was $1,750,000 per plant, payable when construction of the plant was ordered by the partnership and to be credited to the purchase price when the option was exercised. The right to exercise the option was not to begin until 1991. The private placement memorandum included a tax opinion from Coopers & Lybrand which advised that, upon certain factual assumptions, the limited partnerships would be given partnership tax treatment and therefore losses of the partnership would be available to the individual investors. The opinion noted that IFDC should be able to make the option payment without drawing on the R & D payment. The government alleges that the program was fraudulent because the R & D payments were a sham supported only by false documentation. As in Count I, the core contention is circular financing.

The government never attempted to explain what happened to the investor cash contributions that, according to the private placement memorandum, were intended to be the cash portion of the R & D payment. The government has not argued that the defendants are guilty because the cash was misdirected. Rather, the government's claim is that the portion of each partnership's R & D payment financed by MIL was a sham. It is also worth noting that several investors testified that they were permitted by the IRS to deduct the cash portion of their investment. Accordingly, the guilt of the defendants depends upon adequate proof of fraudulent financing.

The government's evidence indicates that most of MIL's purported financing of the R

& D payment occurred in the Netherlands at the offices of Insinger, Willems & Cie N.V. ("Insinger"), a credit institution. From the financial records of Insinger placed into evidence, it appears that on December 31, 1979, MIL contributed three-fourths of the R & D payment for 32 partnerships by issuing debits from its account at Insinger and made 32 additional payments to IFDC in the amount of $62,500 each. The purpose of these $62,500 payments is unexplained. That amount is the same as the difference between the amount of the MIL loan to said partnerships and the purchase price of the option to IFDC. The Insinger records reflect that on the same day, IFDC executed 32 debit items in the amount of $1,750,000 each to MIL, totalling $56,000,000.

The second year of the 1979 program was financed at Insinger on December 31, 1980. Instead of MIL making payments to IFDC on behalf of the partnerships, it appears that MIL actually transferred funds to the partnerships and they paid IFDC directly. The Insinger records in evidence show that MIL debited $23,184,703 to 18 partnerships. The partnerships debited $23,184,703 to IFDC. IFDC debited $23,184,703 in return for promissory notes from MIL.

Also financed on the last day of 1980 at Insinger through Insinger accounts was the first year of a methanol program independent from the 1979 program. MIL debited $16,875,000 to 10 partnerships. The partnerships debited $16,875,000 to IFDC. IFDC debited $16,875,000 to MIL.

Two partnerships, Cocahol Land (Cocahol) and Cocahol Land II (Cocahol II) were financed at the First Cayman Bank in the Cayman Islands. Cocahol was financed in September, 1979. Unlike the other financing transactions, the part of the R & D payment that is payable from the investor's cash contribution appears from the records. That is to say, the entire $2,250,000 R & D payment appears, not just the $1,687,500 payable by MIL. Funds flowed back from IFDC to MIL and to Cocahol. The records in evidence reflect that Cocahol received investor funds in the amount of $456,250.

Cocahol received $106,250 from the account of Alan Vaughn, the general partner of Cocahol. Cocahol wrote a check in the amount of $562,250 to IFDC. IFDC wrote a check in the amount of $562,250 to Vaughn's account. MIL wrote a check in the amount of $1,687,500 to IFDC. IFDC wrote a check in the amount of $1,687,500 to MIL.

Cocahol was apparently financed again on September 26, 1980, at the First Cayman Bank. International Block Construction Company (IBCC), a company beneficially owned by Kilpatrick, paid Cocahol Land $90,353. MIL paid Cocahol Land $1,309,647. Cocahol Land wrote IFDC a check for $1,400,000. IFDC wrote MIL three checks totalling $1,309,647. IFDC wrote a check to IBCC for $90,353. Cocahol was also financed at Insinger for the year 1980 in the amount of $1,073,101. Thus, a total of $2,473,101 was apparently paid for R & D to IFDC by MIL. Yet, only $1,683,647 was listed as a deduction on Cocahol's partnership tax return.

Cocahol Land II was financed on December 10, 1980, at the First Cayman Bank. IBCC wrote Cocahol Land II a check for $458,000. MIL wrote Cocahol II a check for $1,600,000. Cocahol II wrote IFDC a check for $1,600,000. Cocahol II wrote MIL a check for $458,000. IFDC wrote MIL a check for $1,600,000. MIL wrote IBCC a check for $458,000. Cocahol II was also double funded for 1980. $1,107,523 was financed at Insinger, yet only $1,695,490 was deducted on Cocahol II's partnership tax return.

■ The government does not claim that deductions would not be available for research and development payments under the circumstances described in the private placement memorandum. Instead, the government's central argument is that the transactions at First Cayman and Insinger were shams. The evidence does not show beyond a reasonable doubt that the purported payments from the partnerships to IFDC were not actual transactions. It is true that neither the partnerships nor MIL had on deposit at Insinger funds sufficient to make the payments. However, the

government introduced into evidence documents showing that the relationship among Kilpatrick, MIL, IFDC and Insinger was more than making merely Insinger a conduit for an exchange of debits and credits. Government Exhibit 42–7 is a line of credit agreement, dated December 28, 1979, in which Kilpatrick represents that UFO has sold inventions and secret processes to IFDC in consideration for future payments for the exploitation of licenses for methanol production; that Insinger has a contract with IFDC for purchasing IFDC receivables and that Insinger has a standby commitment to loan $1,750,000 to MIL. Insinger agreed to

> commit[ ] a line of credit sufficient to cover those certain outstanding loan commitments of MARLBOROUGH INVESTMENTS LIMITED, a Cayman Corporation, to I.F.D.C. Territorial Licensees as MARLBOROUGH may request from time to time. This stand-by accommodation commitment is subject to and conditioned upon maintenance of collateral security in favor of [Insinger] as provided below.

Kilpatrick agreed to give Insinger a first mortgage deed on a Clalite Cement Block manufacturing plant in Colorado, appraised for $5,000,000, together with a personal continuing guarantee to secure Insinger's advancements to MIL. Additionally, MIL is to pledge to Insinger mortgage liens on methanol plants to be constructed. By all appearances, this agreement constitutes a commitment by Insinger to fund MIL's loan obligations to the methanol partnerships. Accordingly, it cannot be said that the government has proved beyond a reasonable doubt that the financing did not occur.

Other government exhibits indicate that the relationship with Insinger was legitimate. Government Exhibit 42–1 is an agreement dated August 30, 1979, for the sale of notes receivable by IFDC to Insinger in exchange for its note payable to IFDC and the undertaking of two contracts: a license agreement for German and Dutch speaking nations and a brokerage contract for the acquisition of an original artwork. While the document refers to certain exhibits as attachments, they were not included with the exhibit introduced into evidence. Government Exhibit 42–2 is an art acquisition brokerage contract and Government Exhibit 42–3 is a commission contract in which IFDC appoints Insinger as sales agent for marketing investments to exploit the methanol licenses. Government Exhibit 42–4 is an unsigned copy of a promissory note, dated August 30, 1979, from Insinger to IFDC in the principal amount of $319,-300,000, payable December 31, 1979. The document describes that it is secured by a collateral transfer agreement pledging notes receivable from third party payors in the amount of $319,500. Government Exhibit 42–5 is designated a collateral transfer agreement, dated August 30, 1979, reciting that Insinger has pledged certain third party receivables owned by it pursuant to an agreement for the sale of notes receivable from IFDC and the agreement purports to appoint UFO as escrow agent and stakeholder to hold such receivables to be delivered to IFDC upon default on Insinger's note. There is nothing in evidence to support a finding that these documents are fabrications or that Insinger was or is anything other than a European-style banking institution. Inclusion of these documents in the government's presentation of evidence casts great doubt on the sham theory of criminal liability.

The prosecutors have made much of a letter, dated June 28, 1979, from Kilpatrick to Wilson Quintela as an admission of Kilpatrick's fraudulent intent. For that purpose, emphasis was placed on those portions of the letter asserting Kilpatrick's ownership of IFDC and Quintela's position as a figurehead for the company. Kilpatrick refers to his intention to take back the corporation and to be able to say that Quintela owns it if Kilpatrick is asked that question. Included in the letter are the following two paragraphs:

> 1. Due to the international nature of the alcohol patents it was necessary to change the ownership to an international corporation. Therefore, I.F.D.C. was formed as an international corporation in Cayman. U.F.O. sold all these rights

and patents to I.F.D.C. but kept the administration, management and sales responsibilities in U.F.O. in the U.S.

2. It is my intention to continue to own and control I.F.D.C. because that is where all the money to be made in the plants, as well as the plant ownership will end up. However, in the initial sales in the U.S. it is important that I show different owners in each company. (U.F.O. & I.F.D.C.) This is not illegal, it simply saves a tremendous amount of work and explanation to the U.S. investors.

Government Exhibit 52–5.

Also included in the same letter are the following three paragraphs:

I have tried on several occassions (sic) to explain the problems concerning the research and development. I failed to make it clear I guess because of the language problem. Let me first say again there *is no* problem. We *know now* we can build the plant. We *knew* it before we started the R. & D. We *know* it will make alcohol with the raw materials and the efficiency forecasted when I was there.

The reason for research and development is the *TAX LAWS of the U.S.* If we simply build the plant—no deductions would be available to U.S. investors in the year of the investment. The price of the plant *this year* is $7,200,000. We are merely calling $2,200,000 of the $7,200,-000 in order to *deduct* that amount from U.S. taxes *this* year.

The first plant is being fabricated *now.* It will be finished and ready for installation by July 15, 1979. The installation will be completed August 1, 1979 at 5959 Osage Street, Denver, Colorado. It will be in operation at all times beyond that date, if anyone from Brasil wishes to see it. We will be using both coal and petroleum coke as raw materials. We will not use wood, sewage, garbage or any other materials containing less than 50% carbon. Those are materials used by those who do not know how to do it *our* way. They make no economic sense whatever.

Kilpatrick's statements concerning the fabrication of the first plant has some support from the testimony of John T. Cook who said that he visited a plant on Pecos Street in Denver before making his investment in November, 1980. The reference by Kilpatrick to the tax laws as the reason for research and development suggests that the plant was going forward into construction with an artificial allocation to R & D expense. While that would be an inappropriate deduction, it is far different from the government's view that there was no financing. Also in the same Kilpatrick letter, reference is made to having 20 orders for plants. That suggests that the IFDC payments may well have been for the purchase of options on plants ordered. Of greatest significance in this "smoking gun" letter is the insistence of Kilpatrick on re-acquiring IFDC because he expected to make money from it. The inference is that money would be made in the future from the programmed development. That is quite different from the prosecution view that this whole effort was simply motivated by taking the initial cash investment. Some of the subterfuge and use of off-shore entities with secret record keeping is explained by the fact that Kilpatrick was being dogged by an SEC investigation with court enforced administrative subpoenas in January, 1979, seeking complete records of P & J and the coal companies from January 1, 1977. O'Donnell testified that the Colfax National Bank refused further participation in financing because of the SEC subpoenas. An effort to escape strict scrutiny of the SEC is not the equivalent of an intent to defraud the IRS.

■ It is commonplace to describe the evidence in a complex case as pieces in a jigsaw puzzle. The analogy is apt in this case because although the government has admitted hundreds of exhibits and weeks of testimony, there are too many missing pieces to complete the picture portrayed by Counts I and II of the indictment. If this were a civil case, the defendants would be required to explain many things to meet a strong prima facie case of fraud. Here, however, the defendants need explain nothing. The government's approach to this

prosecution has been simplistic: proof of check circles is proof of tax fraud. It is not that easy. The ordinary check kite case is prosecuted as a mail fraud with the involved banks as victims. The transactions here were with full knowledge and participation of the banks. There is sufficient evidence in the government's own proof to create a reasonable doubt about the defendants' intentions. The prosecution has not foreclosed permissible inferences that each of the defendants did indeed seek to create attractive investment opportunities with significant tax advantages but with the primary goals of producing coal and methanol. The prosecution has also not convincingly shown that the deductible expenditures were not made in cash. These failures of proof create a reasonable doubt concerning the economic substance of the programs which entitles the defendants to acquittal of the conspiracy charges.

## COUNTS III–XXVI

Counts III through XXVI charge the defendants with mail fraud, filing false tax returns and aiding and abetting the filing of false tax returns in connection with the schemes alleged in Counts I and II. Counts XIII, XIV, XXIV, XXV and XXVI, charging mail fraud, were dismissed by the court on August 25, 1989 upon the government's oral motion. Count XXVII was severed by order of the court on August 23, 1988 and was not directly at issue in the trial.

Counts III through X of the indictment charge each of the defendants with violations of 26 U.S.C. § 7206(2) by aiding and assisting in the filing of false and fraudulent tax returns. The counts vary only in the particular individual and partnership tax returns in which deductions were taken for advance minimum royalty payments and R & D expense. These charges differ from the general aiding and abetting provision in 18 U.S.C. § 2 in that the government need not prove that the falsity or fraud has with the knowledge or consent of the person required to file the return. It is sufficient to show that the returns were false or fraudulent as to any material matter; that the defendant aided or assisted in the preparation or filing of the return and did so willfully. In this context, willfully is the intentional violation of a known legal duty. That duty is the taxpayer's duty to file a tax return believed to be true and correct as to every material matter.

The deductions and losses in question are undoubtedly material matters. It is also clear that each of the defendants participated in the coal lease programs and methanol programs and are responsible for the advice to the subject taxpayers to take the deductions as they did on these returns. Accordingly, the controlling question is whether the government has proved beyond a reasonable doubt that the defendants knew that the deductions were not authorized factually or legally. Essentially, the government's theory of criminality on these charges is an echo of the contentions made in Counts I and II. The contention is that the claims for deductions and losses are false and fraudulent because the underlying transactions were shams. The determination that the government failed to prove that the transactions were shams defeats that contention on these charges and the defendants are found not guilty of them.

Count XI charges that Kilpatrick filed a false tax return for the calendar year 1979 by claiming a partnership loss in the amount of $2,002,945. Count XII charges O'Donnell with the filing of a false tax return for the calendar year 1979 by claiming a partnership loss of $148,533. These partnership losses were based upon losses of Agosto Ltd., a participant in the methanol transactions. Again, the government's failure to prove the fraudulent financing scheme described in Count II is determinative of these counts and the defendants are found not guilty on them.

Counts XV through XXIII charge mail fraud. The schemes to defraud supporting each remaining count are the schemes alleged in Counts I and II which were incorporated by reference. Here the

government must prove that the investors were the subject of the schemes both in the purchase and the use or benefit of the tax shelters sold to them. Again, conviction on these counts requires proof that each of the defendants participated in the conspiracies charged in Counts I and II with the requisite intent—to engage in sham transactions for the purpose of causing the purchasers to believe that they were obtaining legitimate tax deductions. A distinction must be drawn between mail fraud and securities fraud. The defendants were not charged with misleading the purchasers by misstating or omitting material statements from the offering circulars or memoranda. The adequacy of these disclosures is not an issue under these charges. What the government had to prove to convict on the mail fraud counts are the same sham transactions required for the conspiracies in Counts I and II and the failure of proof there controls the determination on these charges, which must be not guilty. What is missing from the case is a tracing of the cash payments from the investors and a sufficient showing that the coal reserves were inadequate to support the debt burden in Count I and the lack of adequate assets in IFDC for its obligations in Count II.

Upon the foregoing, it is

ORDERED that William A. Kilpatrick is found not guilty of all charges against him in the indictment with the exception of Count XXVII, which has not been tried, (Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, and XXIII); and it is

FURTHER ORDERED that Declan O'Donnell is found not guilty of all charges against him in the indictment (Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XII, XV, XVI, XVII, XXII, and XXIII).